## State of Vermont v. Ronald G. Couture

[734 A.2d 524]

No. 97-426

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed May 7, 1999

*Dan M. Davis*, Windham County State's Attorney, and *Christopher C. Moll*, Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Charles S. Martin* and *Charles Tetreault* of *Martin & Associates*, Barre, for Defendant-Appellant.

**Morse, J.** Defendant Ronald Couture appeals his second-degree murder conviction after a jury trial. Defendant contends that his conviction should be reversed because the trial court erred by: (1) denying his motions for judgment of acquittal and for a new trial, (2) admitting evidence of a drop of human blood on his boot in violation of the Fourth Amendment and V.R.E. 403, and (3) failing to describe the elements of murder and the lesser included offenses in the jury instructions in the order he requested. We affirm.

Randy Barrows' body was discovered in the early morning hours of June 23, 1993 lying on a path near the Connecticut River in Brattleboro. The police responded to the scene shortly after 6:00 a.m. There was a single bullet hole in Barrows' head. The entry wound was just above Barrows' left ear at the temple. An autopsy indicated that the bullet had travelled horizontally with a slight forward pitch from back to front. Barrows was lying face up with his left arm extended down and his right hand positioned around a brown bag. The weapon was not at the scene.

At trial, defendant claimed that Barrows committed suicide. The State sought to prove that defendant shot Barrows with evidence consisting of testimony from several of defendant's friends and associates who had seen him on the night of the shooting.

On June 22, 1993, defendant was temporarily staying at the Fletcher residence in Brattleboro after he and his wife had had an argument. Defendant, Barrows and another friend, Harry Goddard, started drinking early that evening at Barrows' residence. Large quantities of beer were consumed during the evening. The autopsy revealed that Barrows' blood alcohol content at the time of his death was .326 percent. On prior occasions when Barrows was drinking, he had professed his desire to commit suicide, and he reiterated his wish that evening. Defendant offered to sell Barrows a .22 caliber rifle to use for his suicide. After drinking beer and discussing the weapon, the three men left Barrows' residence and proceeded to Deborah Wilkins' house to drink more beer. Wilkins was acquainted with defendant and was a neighbor of Barrows.

At around 8:30 p.m., one of the men called a cab from the Wilkins' house in order to retrieve defendant's rifle from the Fletcher residence. Wilkins testified that when the cab arrived Barrows did not want to go and that Goddard "pushed him into the cab." The cab driver testified that Barrows' companions were "harassing" him, "picking on him and slapping him in the back of the head." When they arrived at their destination, the three men went inside while the cab driver waited outside. Barrows eventually paid for the cab. The cab driver testified that he "saw the thinner man from the back seat grab the little guy by his neck and drag him out of the front door of the house and tell[] him to pay [] for the ride."

While inside the house, defendant's friend, Scott Denyou, observed defendant retrieve the rifle from a duffle bag. Denyou had known both defendant and Barrows for many years. Denyou asked defendant what he was doing, and defendant replied that "he was going to shoot someone."

Goddard testified to the events that followed. From defendant's temporary residence, the three men walked to the Riverview Restaurant for Barrows' last meal. Defendant carried the rifle wrapped in a garbage bag, and Barrows carried a bag full of beer. The restaurant was closed, and the men continued toward the river where Barrows eventually laid down on the ground with the beer by his side and said, "this will do." Defendant unwrapped the rifle and handed it to Barrows, who placed it beside him. Goddard then took a beer with

him and walked back up the path alone toward the restaurant. Goddard testified that, moments after he left the scene at the river, he sat on the hood of a car, and "[s]ome sort of time elapsed and I heard a pop." Goddard then started to walk back down the path where he met defendant approaching with the rifle in hand. Defendant told Goddard "Randy is gone." They wrapped the rifle in the garbage bag and the two men left the area. Defendant and Goddard walked from the river to the house of another friend nearby, William Sabolevski, where they drank more beer. Goddard informed Sabolevski that Barrows was "gone" and that "you don't have to worry about Randy anymore." Defendant admitted to Sabolevski when they arrived that "He [Barrows] wanted to die and I popped him. I did it."

Goddard emptied the remaining bullets from the rifle and wrapped them in a paper towel, which he later threw down a storm drain after he and defendant left the Sabolevski residence. When defendant and Goddard departed, they took a fishing pole so that anyone who saw them arrive with the rifle would see them with a similar package on the way out. The next morning, Sabolevski, standing on his back porch, saw Barrows' body lying on the path. He found the rifle in the hallway outside of his front door. Sabolevski then dismantled the rifle, packed the pieces in a box with some old clothes, and put it in a dumpster.

The police questioned Sabolevski, who informed them that Goddard and defendant had stopped at his house the night before, and that the rifle was in the dumpster. An officer picked defendant up on June 23, and he was questioned by detectives at the police department. No arrest was made at that time. After further questioning on June 25, defendant was arrested and charged with first-degree murder.

Another officer observed "drag marks" on the path leading to Barrows' body. The State suggested that Barrows was dragged to the place where he was shot. Goddard testified that Barrows had walked willingly down the path. In addition, the State offered fingerprint evidence taken from the rifle. Tests revealed only defendant's fingerprints, but the jury heard testimony regarding the handling of the weapon, including Sabolevski's testimony that he had wiped the gun off before placing it in the dumpster. The State also introduced evidence of blood taken from defendant's clothing.

Defendant did not testify at trial, but the jury saw portions of a videotaped interview conducted prior to his arrest. The jury found defendant guilty of second-degree murder.

## I.

After the State's case and at the close of all the evidence, defendant moved for judgment of acquittal under V.R.Cr.P. 29 based on insufficiency of the evidence. The trial court denied these motions, and also denied a defense motion for a new trial under V.R.Cr.P. 33. Defendant claims that the trial court erred by denying his motions for judgment of acquittal and for a new trial. Defendant contends that the evidence was insufficient to support the conviction and that the verdict was against the weight of the evidence. He claims that the State's evidence admitted of only one logical conclusion: Barrows committed suicide.

 Our standard for reviewing a denial of a V.R.Cr.P. 29 motion for judgment of acquittal gauges whether "'the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt.'" *State v. Delisle*, 162 Vt. 293, 307, 648 A.2d 632, 641 (1994) (quoting *State v. McBurney*, 145 Vt. 201, 204, 484 A.2d 926, 928 (1984)). Defendant urges us to reconsider our previous decision in *State v. Miller* in which we affirmed a second-degree murder conviction based largely upon circumstantial evidence. See *State v. Miller*, 146 Vt. 164, 502 A.2d 832 (1985). Defendant asks us to apply a more rigorous analysis when reviewing motions for judgment of acquittal in cases based solely on circumstantial evidence. We decline to fashion a hard and fast rule regarding the sufficiency of evidence in a circumstantial case. Rather, each case must be based on its own facts and circumstances, and a judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict. See *State v. Devine*, 168 Vt. 566, 567, 719 A.2d 861, 863 (1998) (defendant's motion for judgment of acquittal properly denied where State established prima facie case of criminal negligence).

 Here, a prima facie case of first-degree murder required the State to show that defendant intended to kill Barrows and that he did so deliberately and with premeditation. See 13 V.S.A. § 2301; *State v. Johnson*, 158 Vt. 508, 515-17, 615 A.2d 132, 136-37 (1992). The prosecution offered circumstantial evidence to show that defendant shot Barrows, including the nature of the bullet wound which, while far from conclusive, indicated that suicide was improbable. The State is not required to exclude every reasonable hypothesis of innocence if the inferences drawn from circumstantial evidence amount to more

than "mere suspicion." *State v. Durenleau,* 163 Vt. 8, 12, 652 A.2d 981, 983 (1994). Furthermore, the State offered direct testimonial evidence that defendant admitted that he was "going to shoot someone" and confessed after Barrows' death that he had "popped him." Reviewing the evidence in the light most favorable to the prosecution and excluding defendant's modifying evidence, the State's case was sufficient to carry its burden under 13 V.S.A. § 2301, and withstand defendant's motion for judgment of acquittal. See *State v. Grega,* 168 Vt. 363, 382, 721 A.2d 445, 457 (1998).

■ A motion for a new trial under V.R.Cr.P. 33 "tests the sufficiency of all the evidence presented at trial . . . [and] raises the question whether the jury has correctly performed its function of evaluating admittedly adequate evidence." *State v. Cate,* 165 Vt. 404, 413, 683 A.2d 1010, 1017 (1996) (internal quotations omitted). A motion for a new trial requires the court to weigh the evidence, but permits a new trial "only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *State v. Ladabouche,* 146 Vt. 279, 285, 502 A.2d 852, 856 (1985); see also *State v. Trombly,* 148 Vt. 293, 297, 532 A.2d 963, 966 (1987) (noting that jury is ultimate arbiter of questions of fact; granting of new trial is remedy to be used sparingly and only in exceptional circumstances).

Defendant's arguments supporting his motion for a new trial are the same as those supporting his motion for judgment of acquittal. He urges us to reconsider the conflicting testimony that the jury considered regarding "drag marks" that appeared on the path leading down to where Barrows' body was found. Similarly, he recounts the testimony concerning the blood evidence and argues that it did not support an inference of guilt. Defendant also notes that suicide was not ruled out as a cause of death based on the State's physical evidence regarding the wound and the weapon. Defendant maintains that many of the State's witnesses were drunk at the time that the police interviewed them and that the trial testimony relating statements made to the officers was incredible.

We have long recognized that judging the credibility of witness testimony is a duty left to the jury. See *State v. Johnson,* 158 Vt. at 512, 615 A.2d at 134 (assessing credibility of witnesses is province of jury; even though witness was intoxicated at time events occurred and inconsistencies were brought forth through cross-examination, first-degree murder conviction upheld); see also *State v. Tenney,* 143 Vt. 213, 216, 464 A.2d 747, 748 (1983) (where contradictory evidence is

introduced, it is exclusive province of jury, as finders of fact, to resolve contradictions and decide who to believe). Defendant's factual arguments relate to judgments that the trial court properly left for the jury to resolve.

■ While defendant highlighted shortcomings in the State's case before the jury, we cannot hold that the verdict was against the weight of the evidence. The trial court did not abuse its discretion by denying defendant's motion for a new trial. See *State v. Elkins*, 155 Vt. 9, 19, 580 A.2d 1200, 1205 (1990) (ruling on new trial motion is matter of discretion).

## II.

After the arrest, the police collected blood from defendant's pants and boots. Defendant admitted that they were the same clothes that he had been wearing on June 23. Upon testing, the blood on the pants was consistent with defendant's blood and not consistent with Barrows'. The blood drop on the boot, however, was identified only as human blood because a more specific test could not be run on the small sample. Defendant objected to the admission of the unidentified blood drop under V.R.E. 403 (otherwise relevant evidence may be excluded if probative value substantially outweighed by unfair prejudice). The court admitted the evidence over defendant's objection.

Defendant contends that the trial court erred by admitting the drop of blood taken from his boot, claiming that the court should have excluded the blood drop under V.R.E. 403. Defendant also raises a Fourth Amendment claim on appeal, contending that the blood evidence was the product of an unlawful seizure. No Fourth Amendment objection was raised at trial with respect to seizure of the boot.

Addressing the trial court's V.R.E. 403 ruling first, we note that the blood evidence was not particularly relevant to any issue in the case. It neither hurt nor helped the State or defendant, and raised more questions than answers. The only plausible explanation for the blood on the boot was that it was defendant's, who claimed that he had a nose bleed earlier that day. There was no dispute that the blood tested was more likely defendant's blood than the victim's. The jury would hardly place much weight on the surmise that the untested blood on defendant's boot was from a different origin than the blood on the pants.

■ Defendant maintains that admitting the unidentifiable blood drop created an inference that it was Barrows' blood, and that it required him to prove his innocence. The court noted the inferences

that the jury could have drawn and considered the ample evidence attributing the blood on defendant's pants to him and the clear indication that the blood on his boot could not be conclusively attributed to anyone. The court found no significant prejudice, and we find no abuse of discretion in admitting the blood evidence under V.R.E. 403. See *State v. Goodnow*, 162 Vt. 527, 530-31, 649 A.2d 752, 755 (1994) (trial court rulings on evidence reversible for abuse of discretion).

■ Defendant further contends that it was plain error for the court to admit the blood on his boot because the boot was seized in violation of the Fourth Amendment (protecting persons from unreasonable search and seizure). See *State v. Forant*, 168 Vt. 217, 220, 719 A.2d 399, 401 (1998) (plain error exists only in extraordinary situations where error is obvious and strikes at heart of defendant's constitutional rights or results in miscarriage of justice). Each case must be judged on its own record to decide whether the error "is so prejudicial that it undermines confidence in the outcome of the trial." *State v. Johnson*, 158 Vt. at 513, 615 A.2d at 134 (internal quotations omitted). Defendant did not raise the issue below, and he urges us to assume facts that were not established at trial. Any prejudice from admitting the blood drop does not warrant reversal under plain error review.

## III.

Defendant finally contends that the court committed reversible error in its charge to the jury. Defendant requested that the court instruct the jury to begin deliberations by considering involuntary manslaughter, then voluntary manslaughter, progressing to the more serious charges of second-degree murder and first-degree murder. The court obliged defendant, but began the instructions by explaining the elements of each offense beginning with first-degree murder and ending with involuntary manslaughter. The court ultimately charged the jury as follows:

> Now, ladies and gentlemen, if you reach the point of determining what degree of homicide is involved in this case, the presumption of innocence is to be considered in that determination of degree. . . .[T]he Defendant is first presumed innocent of any crime. But if you find . . . that the Defendant did unlawfully take the life of a human being . . . the offense is presumed to be the lesser degree. . . . At each step you must apply the presumption of innocence and weigh it against the evidence. You should begin with the

230

least serious offense and only move upward if you have been convinced as to the additional elements of the higher offense beyond a reasonable doubt.

We find no error.

Defendant relies primarily on our previous holding in *State v. Duff*, 150 Vt. 329, 554 A.2d 214 (1988), and its progeny for the proposition that the trial court must honor the order that defendants request for charging lesser included offenses. In *State v. Powell*, 158 Vt. 280, 608 A.2d 45 (1992), we overruled *Duff* and held that if a defendant requests a more or a less "rigorous" charge, that "'the court should give the form of instruction which the defendant seasonably elects.'" *Id.* at 284, 608 A.2d at 47 (quoting *United States v. Tsanas*, 572 F.2d 340, 346 (2d Cir. 1978)). The trial court may "give either . . . charge, unless the defendant requests one or the other." *Id.*

■ We must review the jury instructions in their entirety to determine whether they sufficiently guided the jury without a prejudicial impact on deliberations. See *State v. Pelican*, 160 Vt. 536, 539, 632 A.2d 24, 26 (1993) (jury instructions must be considered as a whole). Here, the trial court fully complied with defendant's request in its final charge and clearly instructed the jury to transition upward from not guilty to first-degree murder. Defendant has failed to show how explaining the elements of each offense in descending order of severity prior to the final charge resulted in prejudice. See *United States v. Abelis*, 146 F.3d 73, 82 (2d Cir. 1998) (viewing instruction as a whole, appellant bears burden of showing prejudice).

*Affirmed.*