2013 VT 27

## State of Vermont v. Rusty Brooks

[70 A.3d 1014]

No. 11-329

Present: **Reiber, C.J., Dooley, Skoglund, Burgess** and **Robinson, JJ.**

Opinion Filed March 29, 2013

462

*Christina Rainville*, Bennington County Chief Deputy State's Attorney, Bennington, for Plaintiff-Appellee/Cross-Appellant.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant appeals convictions on two counts of aggravated sexual assault on a minor following a jury trial, alleging three errors. Defendant asserts that the trial court committed reversible error by failing to suppress all statements made to the police on August 31, 2009, and by admitting evidence of defendant's website-browsing history. Defendant also contends that the introduction of previously excluded testimony at trial rendered the trial unfair. As a final matter, defendant maintains that even if none of his individual claims constitutes reversible error, the cumulative effect of all errors denied him a fair trial. We disagree and affirm defendant's convictions.

¶ 2. The facts are as follows. On August 31, 2009, defendant was called into the Bennington Police Station and questioned by Detective Cole for approximately forty minutes regarding allegations of sexual abuse of defendant's twelve-year-old daughter. Defendant denied the allegations during the interview. At the conclusion of the interview, defendant was arrested and placed in a holding cell. Six hours later, Detective Plusch approached defendant to arrange defendant's dinner.

¶ 3. Defendant asked "what was going on" in the case, and Detective Plusch informed him of the current police investigation. Defendant then volunteered, "Well, if everyone said I did this I must have." At the time, police had not informed defendant of his *Miranda* rights. Detective Plusch immediately advised defendant that if he wished to talk about the case, he would need to wait so Plusch could get the necessary paperwork and move defendant to an interview room. Ten minutes later, Detective Plusch transferred defendant to an interview room and advised him of his *Miranda* warnings. Defendant informed Detective Plusch that he under-

stood his rights, was willing to discuss the case, and did not want to contact an attorney at that time. Defendant signed the *Miranda* rights form. Defendant also consented to a sworn recorded statement.

¶ 4. Detective Plusch interviewed defendant for approximately seventy-five minutes. Defendant initially denied all allegations of sexual molestation. Defendant, however, provided hypothetical answers, saying, "I don't remember ever doing anything . . . [but] it probably happened naturally . . . . she'd probably take her [pants] off and I'd do mine. . . . probably she just lays down and I get on top of her . . . put a condom on and I'd probably start having sex with [her]." Eventually, Detective Plusch left defendant with a blank statement form and told him that if he wanted to write a statement, he could fill out the form. Defendant wrote an incriminating statement, confessing to having sexual intercourse with his twelve-year-old daughter. He subsequently signed the statement in the presence of Detective Plusch.

¶ 5. At a pretrial suppression hearing, defendant challenged the validity of all statements given to the police on that day in August, claiming that his statements were involuntary and taken in violation of his *Miranda* rights. The trial court suppressed the pre-*Miranda*-warning statement given in the holding cell, concluding that defendant was not properly informed of his right to remain silent while under custodial interrogation, and therefore, such statements were obtained in violation of defendant's Fifth and Fourteenth Amendment rights and inadmissible. The court, however, admitted the post-*Miranda*-warning statements, finding that the unwarned statement did not taint subsequent warned statements, as discussed below.

¶ 6. Also prior to trial, the State gave notice pursuant to Vermont Rule of Criminal Procedure 26(c) that it intended to offer evidence of defendant's history of browsing pornographic and incest websites. Defendant objected to the evidence, arguing that it was not relevant and could not be connected to defendant specifically, as others in the house used the computer. He further argued that its prejudicial effect substantially outweighed any probative value regarding the charged counts. The trial court permitted the State to present a "limited list of site names" related to incest as prior bad acts under Vermont Rule of Evidence 404(b), finding the probative value of these sites to show a plan, scheme, or motive and to outweigh the prejudicial effects, as discussed in detail below.

¶ 7. At trial during the State's case-in-chief, Detective Plusch began to repeat defendant's excluded holding cell statement. Defendant objected. The court sustained the objection and instructed the jury to "ignore [Detective Plusch's] response." The jury found defendant guilty of two counts of aggravated sexual assault on a minor in violation of 13 V.S.A. § 3253(a)(8). This appeal followed.

¶ 8. Defendant asserts that the trial court erred in failing to suppress all statements he made to the police on August 31, 2009, as a violation of his constitutional rights. As noted, the court suppressed defendant's statement made in the holding cell before being informed of *Miranda* rights but declined to suppress statements made to the police after the administration of *Miranda* warnings. Defendant contends the court erroneously concluded that the "mid-stream" *Miranda* warnings effectively safeguarded his rights and that his waiver of those rights was voluntary. We find no error.

¶ 9. "A motion to suppress evidence presents a mixed question of fact and law. While we uphold the trial court's factual findings absent clear error, we review the trial court's conclusions of law de novo." *State v. Bauder*, 2007 VT 16, ¶ 9, 181 Vt. 392, 924 A.2d 38.

¶ 10. The Fifth Amendment grants every citizen the right not to be "compelled in any Criminal Case to be a witness against himself." U.S. Const. amend. V. To safeguard this right, law enforcement officers must warn a person in custody, prior to interrogation, " 'that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *State v. Fleurie*, 2008 VT 118, ¶ 11, 185 Vt. 29, 968 A.2d 326 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings serve to ensure that the person in custody has sufficient knowledge of his constitutional rights concerning the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary. *Id.*

¶ 11. The U.S. Supreme Court has articulated two standards for assessing whether the failure to administer *Miranda* warnings by law enforcement in an initial interrogation taints subsequent warned statements, which we discussed at length in *Fleurie*. 2008 VT 118, ¶¶ 12-21. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the

Court found that, despite the officers' initial failure to administer *Miranda* warnings, the defendant's post-warning confession remained admissible. It held that without more, a simple failure to administer warnings will not preclude the admissibility of statements made subsequent to a voluntary and informed waiver. *Id.* at 300. But, the Court cautioned, if the failure to administer warnings was accompanied "by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," the same result may not follow. *Id.* at 309.

¶ 12. Nineteen years later, the Supreme Court confronted a coercive and manipulative practice in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, police deliberately withheld *Miranda* warnings before an initial interview, extracted a full confession, and then gave the suspect a twenty-minute break. After the break, the police then administered *Miranda* warnings, obtained a waiver, resumed questioning, and then elicited a second confession, pressuring the defendant into giving the same responses that she had given earlier. A plurality of the Court rejected the idea that a subsequent recitation of *Miranda* warnings, after a manipulative interview had produced a confession, could satisfy *Miranda*'s guarantees. It concluded that question-first interrogation techniques, designed to circumvent *Miranda v. Arizona*, may make subsequent warned statements inadmissible. *Seibert*, 542 U.S. at 609-13. The Court wrote, once a defendant thoroughly incriminates himself, a mid-stream warning may fail to "reasonably convey that he could choose to stop talking." *Id.* at 612. Therefore, the plurality adopted a five-factor test to assess the effectiveness of mid-stream *Miranda* warnings. See *id.* at 615.

¶ 13. Finding substantial overlap between *Elstad*'s "voluntariness" test and *Seibert*'s "effectiveness" test, this Court concluded in *Fleurie* that the two, together, "operate essentially as a totality-of-the-circumstances analysis." 2008 VT 118, ¶ 24. In *Fleurie*, police observed the defendant on the streets a few minutes before receiving a robbery report of an armed suspect matching the defendant's description. Police went to the defendant's mother's apartment and requested permission to speak with her son. The mother let the officers in the home.

¶ 14. Officers confronted the defendant about the robbery and informed him that he matched the description of the suspect. Without being informed of the identifying characteristics of the suspect, the defendant volunteered that he did not have guns or

a mask. Officers told the defendant that they saw him nearby the site of the robbery, to which the defendant responded that he had not left the apartment. Subsequently, he admitted that he briefly left the apartment. Eventually, the defendant was taken to the stationhouse and read his *Miranda* rights. When his mother arrived at the station, the defendant waived his rights and confessed to the robbery. *Id.* ¶ 7.

¶ 15. The trial court suppressed the unwarned statements the defendant made in his home and admitted the confession made at the stationhouse after the *Miranda* warnings were given. *Id.* ¶¶ 8-9. On appeal, based on the totality of the circumstances, this Court affirmed the lower court's decision. We held that "[b]oth effective warnings and a voluntary waiver are needed to safeguard defendants' rights." *Id.* ¶ 24. We found that the warned confession was admissible under *Elstad* and the plurality's test in *Seibert*, as the *Miranda* warnings functioned effectively, and defendant voluntarily waived his *Miranda* rights. *Id.*

¶ 16. In the present case, there is no dispute that the interaction at the holding cell was an interrogation, regardless of how casual a conversation it might appear. Detective Plusch admitted that he hoped informing defendant about the investigation would produce some admission of guilt. The term "interrogation" under *Miranda* refers not only to express questioning, "but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); see also *State v. Christmas*, 2009 VT 75, ¶¶ 10-12, 186 Vt. 244, 980 A.2d 790 (explaining *Innis* controls when determining whether police action amounted to interrogation). In light of the case law and Detective Plusch's own testimony as to his intent, the court was correct in suppressing defendant's response while in the holding cell.

¶ 17. The question presented here, however, is whether the one unwarned statement tainted the subsequent warned interrogation. Our case law requires (1) that a defendant is adequately informed through *Miranda* warnings that he or she has a right to stop speaking to the police and remain silent after making an unwarned incriminating statement; and (2) that the decision to waive his or her rights and make a statement after the *Miranda* warning is voluntary. See *Fleurie*, 2008 VT 118, ¶ 24.

■ ■ ¶ 18. First, we decide if the subsequent *Miranda* warning operated effectively. *Seibert* sets forth five factors to be considered: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. Applying these factors, the trial court found the *Miranda* warning given in the interrogation room after the defendant's statement at the holding cell was effective to convey to defendant his rights to remain silent and to an attorney. We agree.

¶ 19. The record is unclear as to the precise detail Detective Plusch provided defendant regarding the ongoing investigation before defendant provided the statement at issue. Defendant's response, "Well, if everyone said I did this I must have" was vague, and while the statement suggests that defendant participated in the charged acts, it does not refer to specific acts or allegations. As stated in *Fleurie*, "[t]he minimal level of detail elicited from defendant in the initial questioning suggests that . . . the subsequent *Miranda* warnings could operate effectively." 2008 VT 118, ¶ 29. The same is true here.

■ ¶ 20. Comparing defendant's pre-warning and post-warning statements also supports a conclusion that the *Miranda* warnings operated effectively. The greater the overlap between the statements, the stronger the inference that the warnings were ineffective. *Seibert*, 542 U.S. at 615; *Fleurie*, 2008 VT 118, ¶ 30. "In *Seibert*, the Court found it important that after the first interview, 'there was little, if anything, of incriminating potential left unsaid.'" *Fleurie*, 2008 VT 118, ¶ 30 (quoting *Seibert*, 542 U.S. at 616). Here, defendant's pre-*Miranda* statement to Detective Plusch provided no substance. In the second interview, he initially denied the sexual abuse charges, eliminating any residue of guilt from the initial unwarned statement. Accordingly, because the overlapping information between interviews was inconsequential, we find the *Miranda* warnings could operate effectively.

¶ 21. The timing and setting of the two interrogations provided defendant with notice that the post-warning interrogation was a "separate and distinct experience, and that he possessed a real choice between exercising or waiving his right to remain silent."

See *Fleurie*, 2008 VT 118, ¶ 31.. The first interaction occurred while defendant was in a holding cell, and the second took place in an interview room in the stationhouse approximately ten or fifteen minutes later. And, although both interrogations were conducted by Detective Plusch, his questions in the post-warning interview did not refer back to defendant's earlier statement. Rather, the detective treated the interview as a separate event. Cf. *Seibert*, 542 U.S. at 616 (describing that officer referred to unwarned confession, thus giving the suspect the "impression that the further questioning was a mere continuation of the earlier questions and responses"). The warned interview happened outside the realm of the first and was in no way based on earlier questions or responses.

¶ 22. Based on the totality of the circumstances, we find that the *Miranda* warnings given after defendant's initial statement were effectively conveyed so that defendant understood his rights. Having concluded that the *Miranda* warnings were effectively delivered, we now consider defendant's contention that he did not voluntarily waive his rights.

¶ 23. "A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998); see also *State v. Ives*, 162 Vt. 131, 134, 648 A.2d 129, 131 (1994). While there are coercive aspects to any police interrogation of a person suspected of a crime, "our inquiry under *Elstad* is whether the interrogation was so coercive as to undermine defendant's ability to voluntarily waive his rights." *Fleurie*, 2008 VT 118, ¶ 26. In *State v. Bacon*, we explained that the question of voluntariness "is not whether statements made by the interrogators were the cause of defendant's confession, but rather whether those statements were so manipulative or coercive that they deprived defendant of his ability to make an unconstrained, autonomous decision to confess." 163 Vt. 279, 294, 658 A.2d 54, 64 (1995) (quotation and brackets omitted). The trial court must examine the totality of the circumstances in assessing the voluntariness of defendant's confession, and we will not disturb that assessment unless it is clearly erroneous. *State v. Roberts*, 160 Vt. 385, 388, 631 A.2d 835, 837 (1993); see *State v. Weisler*, 2011 VT 96, ¶ 12 n.4, 190 Vt. 344, 35 A.3d 970 (recognizing the erratic reviewing standards for confessions — "review[ing] for clear error . . . while recognizing

the need for an independent determination of the ultimate issue of voluntariness").

¶ 24. In the present case, the facts do not suggest that defendant's will was overborne by coercion or manipulation. As the trial court noted, it is significant that defendant did not immediately confess after waiving his rights. Throughout most of the second interview, defendant maintained his innocence and denied sexually assaulting his daughter. His continued assertion of innocence after waiving his rights strongly suggests that he did not consider his earlier statement to be incriminating and that, consequently, he did not feel manipulated or coerced by the first, unwarned interrogation such that his subsequent waiver of rights was involuntary.

¶ 25. There is no indication on the record that defendant did not understand his rights once he was given the warnings or that his subsequent waiver of those rights was anything but knowing and voluntary. Defendant claims that his confession was a product of coercive psychological police tactics and not voluntary because he was confined to a cell without food, water, shoes, or outside contact. Yet, there is no evidence to suggest that defendant was so uncomfortable as to inform anyone of his deprivations; nor did defendant testify that he was pressured, coerced, or threatened into speaking. Accordingly, we hold that defendant's post-*Miranda* statements were properly admitted.

¶ 26. Defendant next challenges the admissibility of the website-browsing history of incest-related sites that was discovered on a laptop he had in his possession. He argues that the evidence of the incest-based web browsing was irrelevant under Vermont Rule of Evidence 404(b), unfairly prejudicial under Rule 403, and that its primary effect was to show that defendant was a "bad guy." We need not reach the question of admissibility of the list of websites because the error, if any, was harmless. See *State v. Kulzer*, 2009 VT 79, ¶ 15, 186 Vt. 264, 979 A.2d 1031 (declining to reach merits of defendant's argument when alleged error was harmless); see also *State v. Lambert*, 2003 VT 28, ¶ 8, 175 Vt. 275, 830 A.2d 9 ("We will not reverse a criminal conviction for an error we find to be harmless.").

¶ 27. "Error is harmless if we can say beyond a reasonable doubt that the jury would have convicted absent the error." *State v. Williams*, 2010 VT 83, ¶ 35, 188 Vt. 413, 8 A.3d 1053; see also

V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). The two most important factors employed in our inquiry are (1) the strength of the prosecution's case without the offending evidence; and (2) the strength of the offending evidence. *State v. Lipka*, 174 Vt. 377, 385, 817 A.2d 27, 34 (2002). Under this analysis, we also "consider the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial." *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6.

¶ 28. In the present case, the jury saw a list depicting defendant's website browsing. Nevertheless, the list was of little evidentiary import and of limited use. The court instructed the jury that the site list was not introduced "to show [defendant] has a bad character," but only "admitted as part of the State's claim that it shows a general [plan] or scheme about the allegations of abuse of his daughter and how that would fit in."

¶ 29. The court's instructions attempted to limit the purpose of the challenged evidence, and we presume that the jury followed the court's instructions. See *State v. McCarthy*, 2012 VT 34, ¶ 17, 191 Vt. 498, 48 A.3d 616. Further, defendant himself admitted at trial that he went to the incest sites out of curiosity, thereby offering the jury a reason for the browsing history.

¶ 30. When evaluating the strength of the prosecution's case without the offending evidence, the testimony of the defendant, and the admission of the recording of the interrogation, and the publication to the jury of defendant's confession cannot be ignored.

> I, Rusty Brooks, had sex with my daughter [ ] as I loved her and felt close to her and was have [sic] sexual problems with my wife and was thinking that it was my fault and could not get her aroused [sic]. I relize [sic] it was wrong dirty and bad and am very sorry and I would like very much to get counseling and have my family back. I love my hole [sic] family and they mean the world to me once again I am very sorry and hope I get the help I need to get my family back. Please make it known that I am very sorry.

With this evidence before the jury, defendant's website browsing hardly seems significant to the prosecution's case. As such, the

evidence had little utility in either the State's or defendant's case, and therefore, its admission was harmless beyond a reasonable doubt.

¶ 31. Defendant also claims that he was denied a fair trial when Detective Plusch referred to previously excluded testimony. Detective Plusch was the State's first witness. When asked on direct about the conversation with defendant while in the holding cell, Plusch answered:

> We were speaking through the door, and I was asking what he wanted to eat, and that he was trying to talk to me about what was going on, so I opened up the cell door, and we started to talk. . . . I told him that [he will] . . . most likely be held for the evening, and he then said, you know, if everybody thinks I did it —

The defense promptly objected, and in a bench conference, the State acknowledged that defendant's statement had been suppressed and apologized. The court instructed the jury to "ignore any response to that question," and the State moved on.

¶ 32. Defendant asserts that the admission of the excluded statement cost him a fair trial. We disagree and conclude that even though a part of the suppressed statement came in at trial, it did not prejudice the fairness of the trial. The excluded statement had little effect on the prosecution's case. First, the defense cut Detective Plusch off midsentence, leaving the jury to hear only, "If everybody thinks I did it," but not defendant's inculpatory phrase, "I must have." This sentence fragment had little bearing on defendant's guilt or the prosecution's case. What is more, defendant made the same statement during his subsequent interview with Detective Plusch. Because the same statement was introduced properly at trial from the second interview, the evidence was duplicative and had little value in either the prosecution's or defendant's case and therefore it did not prejudice the proceeding.

¶ 33. As a final matter, defendant asserts that, even if the individual claims of error are not sufficient for reversal, the cumulative effect of all the errors is sufficient to render his trial unfair. "The court may grant a new trial if it believes that the cumulative effect of numerous concerns, no one of which can be characterized as reversible error, amounted to a miscarriage of

justice." *State v. Aiken*, 2004 VT 96, ¶ 9, 177 Vt. 566, 862 A.2d 285 (mem.). Because we have not identified any prejudicial errors above, there is no basis for such a conclusion. See *State v. Desautels*, 2006 VT 84, ¶ 29, 180 Vt. 189, 908 A.2d 463. We thus affirm defendant's conviction.[*]

*Affirmed.*

---

[*] We do not address the State's claims on cross-appeal because the State did not properly file a cross-appeal. Furthermore, as we affirm defendant's conviction, any relief sought by the State is unwarranted.