NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 92

No. 2015-010

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Kerri Nicholas | April Term, 2016 |

David Suntag, J.

Kerry A. McDonald-Cady, Windham County Deputy State's Attorney, Brattleboro, for
  Plaintiff-Appellee.

Charles S. Martin and Stacey Knight, Law Clerk (On the Brief) of Martin & Associates, Barre,
  for Defendant-Appellant.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1. **DOOLEY, J.** Defendant was convicted of one count of domestic assault, in violation of 13 V.S.A. § 1042, and one count of cruelty to a child, in violation of 13 V.S.A. § 1304. On appeal, he argues that the child-cruelty conviction should be reversed because the trial court's jury instructions allowed for a non-unanimous verdict, and that the State's conduct during the trial created a risk of undue prejudice with respect to both counts. We affirm.

¶ 2. The evidence presented at trial involved multiple injuries to E.P., the victim, over a few weeks between early September and mid-October of 2012. E.P.'s nursery school teacher testified that E.P. arrived at school on September 7 of that year with two black eyes, after having

missed the first day of school.  The teacher asked the child's mother what had happened, and the mother reported that the child had fallen on a metal bedframe.

¶ 3.     The next incident occurred on September 18, 2012.  The child's teacher testified that E.P. had been absent the previous day, and when the child returned to school on the eighteenth she had a bruise on her face.  Neither the mother nor defendant, who had a romantic relationship with the mother and had moved in with her in April 2012, called the school or provided a note explaining the bruise.

¶ 4.     The teacher next observed an injury to the child a few weeks later on October 10, 2012.  E.P. was again absent from school, and when she arrived the following day, she had "a huge black eye."  The child's left eye was "very swollen" and it appeared to the teacher that the injury "had happened recently."  That morning, the teacher made a report to the Department for Children and Families (DCF).

¶ 5.     E.P.'s mother testified that on the morning she saw E.P.'s black-and-blue left eye, defendant explained that the injury had occurred the night before when he was heading to the bathroom at the same time as the child.  According to the mother's testimony, defendant told her that he and E.P. had bumped into each other, and the child hit the doorknob.  In his interview with police, however, parts of which were admitted at trial, defendant stated that he had been in bed when E.P. hit her face on the bathroom doorknob.

¶ 6.     On October 15, 2012, the DCF worker assigned to the case went to the mother's home with Detective Jonathan Griffus.  When they arrived at the home, E.P.'s mother, E.P., and defendant were all present.  Detective Griffus took a photograph of E.P.'s left eye showing a dark bruise.

¶ 7.     The next day, a pediatric nurse practitioner at Dartmouth-Hitchcock's Child Advocacy and Protection Program conducted a head-to-toe examination of E.P.  During that examination, she observed the following: (1) bruising on E.P.'s upper and lower eyelid, (2) a

small bruise on her forearm; (3) two clusters of petechial bruising (tiny burst blood vessels) on one side of her neck,[1] (4) bruising on the left side of E.P.'s ribs, and (5) a bruise near E.P.'s bellybutton.

¶ 8.    Detective Griffus testified about his investigation, including his interview of defendant.  As noted, the jury watched several segments of that interview in which defendant made statements that were: (1) in conflict with other evidence, such as his statement that he and his mother had taken the child to the doctor after one of the injuries, and (2) inconsistent with other statements he and E.P.'s mother made about the circumstances surrounding the left-eye injury to the child.

¶ 9.    Based on this and other evidence, the State brought four charges against defendant.[2]  Count I charged defendant with domestic assault, and was predicated on the two black eyes sustained by E.P.  Count II was a second charge of domestic assault, this time predicated on the single black eye sustained by E.P.  Finally, Count III was a charge of cruelty to a child between August 1, 2012 and October 16, 2012.  The trial court granted defendant a directed verdict on a fourth charge, a charge of domestic assault tied to bruises on E.P.'s face and abdomen.[3]

---

[1]  According to the nurse, petechial bruising generally occurs from back pressure, which may happen, for example, when a woman is in labor or during forceful fits of coughing.  Another way for petechial bruising to occur is when blood flow has been occluded or blocked.  For example, if clothing were pulled with enough force around the neck, it could cut off blood flow and cause petechial bruising.

[2]  The State initially also charged defendant with domestic assault for causing a bruise on E.P.'s buttocks, but voluntarily dismissed that claim before trial because its witness on that count had relocated and was unavailable for the week of trial.

[3]  Because the court dismissed a charge at the close of evidence, the court renumbered the counts for the purpose of submitting them to the jury.  We use the numbering the court ultimately adopted in its instructions.

¶ 10.    Prior to excusing the jury for their deliberations, the trial court instructed the jury on the law governing the case.  In particular, as to Count III, the trial court gave the following instruction:

> [I]n Count III, [defendant] is charged with the offense of cruelty to a child.  The following are the elements of this offense which must be proven by the State beyond a reasonable doubt: that between August 1 and October 16 of 2012, the defendant: (1) was over the age of sixteen years; (2) had the care of a child under ten years of age alleged to be E.P., date of birth May 31, 2008; (3) caused such child to be ill-treated in a manner to cause such child unnecessary suffering; and (4) defendant did so willfully.
>
> . . .
>
> The third element is that [defendant] caused [E.P.] to be ill-treated in a manner to cause [her] unnecessary suffering.  For this third element the terms are self-explanatory, except for the phrase "unnecessary suffering."  That phrase means physical pain or injury caused to the child that was not inflicted by reasonable corporal punishment.
>
> And the fourth element is that the defendant did so willfully.  For this fourth element, the State must prove that defendant caused E.P. to be ill-treated in a manner to cause her unnecessary suffering willfully, that is consciously and intentionally, as opposed to accidentally or by mistake.
>
> . . .
>
> Your verdicts must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each jur[or] agree thereto.  Your verdicts must be unanimous.

¶ 11.    The jury returned a verdict of not guilty on Count I, arising from the two-black-eyes incident, and guilty verdicts on Counts II and III.

¶ 12.    On appeal, defendant argues that: (1) the jury instruction regarding the child-cruelty count was plain error because the instruction did not make clear that the jury had to be unanimous as to which injury defendant caused to E.P; and (2) multiple incidents throughout the trial collectively created an undue risk of prejudice warranting a reversal.

4

## I. Jury Instructions and Risk of Non-Unanimity

¶ 13.   Because defendant did not object to the jury instruction he now challenges on appeal, we review for plain error.  When reviewing alleged plain error in a jury instruction, we determine whether there was obvious error affecting the defendant's substantial rights, thereby resulting in prejudice to the defendant and seriously affecting the fairness or integrity of the judicial proceedings.  See State v. Buckley, 2016 VT 59, ¶ 15, ___ Vt. ___, ___ A.3d ___. "[W]e examine the instructions in light of the record evidence as a whole and determine if any error would result in a miscarriage of justice."  State v. Herrick, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285.  "This is a very high bar—we find plain error only in rare and extraordinary cases."  Id.

¶ 14.   Defendant argues that the trial court committed plain error by failing to instruct the jury as to which of the injuries it could consider for purposes of making a child-cruelty determination.  According to defendant, the court's jury instructions failed to assure unanimity among the jurors as to whether some or all of the alleged acts occurred in finding him guilty of the child-cruelty charge.

¶ 15.   In so arguing, defendant relies primarily on State v. Couture, 146 Vt. 268, 502 A.2d 846 (1985), overruled in part by State v. Holcomb, 156 Vt. 251, 590 A.2d 894 (1991), and State v. Goyette, 166 Vt. 299, 691 A.2d 1064 (1997).  In Couture, the defendant was charged with a single count of kidnapping even though there were five separate alleged victims.  The trial court instructed the jury that they could find him guilty if they concluded that he kidnapped any one of the five possible victims.  It did not instruct, however, that the jury had to be unanimous in its decision as to which alleged victim or victims were kidnapped.  We found plain error because the charge gave the jury multiple ways to convict the defendant without ensuring unanimity as to the victim or victims kidnapped.  Couture, 146 Vt. at 272, 502 A.2d at 849.  As discussed more fully below, however: "[t]o the extent that Couture is read to hold that the mere

possibility that the jury was not unanimous on an element of the offense because of the instructions is plain error, its holding did not survive Holcomb." In re Carter, 2004 VT 21, ¶ 26, 176 Vt. 322, 848 A.2d 281 ("Indeed, Holcomb intentionally rejected interpreting our prior decisions suggesting that jury instruction errors that caused the possibility that the jurors were not unanimous on an element was plain error per se."). Thus, in addition to the fact that Couture involved five distinct acts—kidnapping five different individuals—it cannot support a plain-error claim that a jury instruction resulted in the mere possibility of a non-unanimous verdict.

¶ 16. In Goyette, a case in which the defendant was charged with one count of violating a relief-from-abuse order, the trial court defined the word "harass" as engaging in repeated acts that trouble or torment another but then instructed the jurors that they could find the defendant guilty if they unanimously agreed that he committed at least one of the six separate acts alleged by the State. We noted that "the court's charge did not assure unanimity among the jurors as to whether some or all of the other acts occurred," but reversed at least in part because "the court's broad definition of harassment permitted the defendant to be convicted on the basis of virtually any behavior that bothered the complainant." Goyette, 166 Vt. at 303-04, 691 A.2d at 1067.

¶ 17. On multiple occasions, this Court has emphasized that a claim of error alleging the failure of the State to make an election or the trial court to give a specific unanimity charge in a multiple-acts case is waived on appeal unless the defendant can demonstrate plain error. The most important precedent is Holcomb, noted above, in which the defendant was charged with and convicted of one count of lewd-and-lascivious conduct with a child, but the evidence indicated that there were two distinct alleged lewd acts. We rejected the defendant's unpreserved argument that the trial court erred by not requiring the State to elect between the two lewd acts disclosed by the evidence. Holcomb, 156 Vt. at 255, 590 A.2d at 896; see 5 W. LaFave et al., Criminal Procedure § 19.3(d), at 336-38 (4th ed. 2015) (stating that although charging of separate offenses in single count can prejudice defendant by producing conviction on

6

less than unanimous verdict as to each offense, "the duplicity defect is viewed as waived" where no objection is raised until after jury verdict).

¶ 18.    In doing so, we explicitly rejected a per se plain-error rule and instead "adopt[ed] the familiar standard of review for plain error" in which we reverse "only in rare and extraordinary cases where we find that the omission in the charge and in the State's actions so affects the substantial rights of the defendant that we will notice the error despite lack of proper objection." Holcomb, 156 Vt. at 255, 590 A.2d at 896; see also State v. Johnson, 158 Vt. 508, 513, 615 A.2d 132, 135 (1992) ("In general, we must examine the record in each case, and determine whether the error is so prejudicial that it undermines confidence in the outcome of the trial." (quotation omitted)).  Applying that standard, we found no plain error, in part, because the "[d]efendant's defense did not distinguish between the two acts, and he was not hampered in preparing a defense." Holcomb, 156 Vt. at 255, 590 A.2d at 896 (concluding also that "the acts were so closely related in time and circumstances as to constitute one continuous offense or transaction").

¶ 19.    In two more recent cases involving unpreserved challenges to the absence of a specific unanimity instruction, we reiterated this standard and emphasized its rigorous nature.  In Carter, we determined that the petitioner, who was convicted of aggravated sexual assault and claimed plain error based on the trial court failing to require unanimity as to whom a threat of serious bodily injury was directed, had "shown a possibility of error, but little likelihood of prejudice." 2004 VT 21, ¶ 24 (emphasis added).  We stated that to prevail on his plain-error argument, the petitioner would have to demonstrate "that it was likely that some jurors found that there were threats to the victim but not to her family while other jurors found just the opposite." Id. (emphasis added).  We concluded that the petitioner had failed to do so, given that the "evidence on both threats was inextricably intertwined" and "the victim often described both threats within the same statement." Id.; see also United States v. Marcus, 560 U.S. 258, 262-63

7

(2010) (rejecting plain-error standard that would set aside conviction based on any possibility of different verdict and holding that for prejudice component of plain-error standard to be satisfied, "there must be a <u>reasonable probability</u> that the error affected the outcome of the trial" (emphasis added)); cf. <u>State v. Wright</u>, 154 Vt. 512, 520, 581 A.2d 720, 726 (1989) (concluding that even where court could have given instruction on diminished capacity and such instruction might have affected jury's deliberations, there was no plain error where defendant did not request instruction, did not object to its omission, did not argue it to jury, and trial did not revolve around defense theory of diminished capacity).

¶ 20.    Similarly, in <u>State v. Prior</u>, where the trial court instructed the jury that the defendant could be found guilty of violating a relief-from-abuse order by "following or stalking" the victim but gave no specific unanimity instruction, we found no plain error because the defendant's consistent position throughout his trial was that he neither stalked nor followed the victim.  2007 VT 1, ¶ 5, 181 Vt. 564, 917 A.2d 466 (mem.)  We concluded that where "evidence relating to alternative theories under which a jury could convict is intertwined throughout the trial and defendant's defense did not distinguish between the theories, we will not find plain error."  <u>Id</u>. ¶ 8.

¶ 21.    Given this case law and the rigorous standard of review, we conclude that this is not one of those rare and extraordinary cases where the interests of justice compel finding plain error.  Whether error exists at all may be a close question in this case, but whether plain error exists under the correct standard is not.

¶ 22.    Jury unanimity is an issue in multiple-acts cases, often child sex-abuse cases, where "evidence is presented of a greater number of separate criminal offenses than the defendant is charged with."  <u>Baker v. State</u>, 948 N.E.2d 1169, 1175 (Ind. 2011); see <u>People v. Cooks</u>, 521 N.W.2d 275, 279 (Mich. 1994) (noting that "<u>United States v. Gipson</u>, 553 F.2d 453 (5th Cir. 1977) is considered a seminal ruling regarding the need for a specific unanimity

instruction when evidence of multiple acts by a defendant are placed before a jury to support a single charged offense"). Courts in different jurisdictions have approached the problem in different ways, but the most commonly followed procedure, often described as the either/or rule, requires either the election of a single act as a basis for the charged offense or an instruction requiring the jury to be unanimous in determining which act supports a conviction. Baker, 948 N.E.2d at 1175-76.

¶ 23. Most courts that have addressed the issue, however, have held "that a specific unanimity instruction is not required in all cases in which more than one act is presented as evidence of the actus reus of a single criminal offense." Cooks, 521 N.W.2d at 279. "The critical inquiry is whether either party has presented evidence that materially distinguishes any of the alleged multiple acts from the others." Id.; see State v. Lomagro, 335 N.W.2d 583, 589 (Wis. 1983) (holding that where multiple criminal acts are conceptually similar, unanimity instruction is not required); see also State v. Hill, 26 P.3d 1267, 1275 (Kan. 2001) ("In many multiple acts cases, the acts will be materially distinct and will be associated with different defenses, so a specific unanimity instruction will be required."). "[W]here the government has presented evidence of a series of materially indistinguishable acts, each of which would factually satisfy the actus reus element of the alleged criminal offense, numerous federal courts have declined to require a specific unanimity instruction." Cooks, 521 N.W.2d at 281. Thus, in cases involving generic evidence of repeated sex acts, "neither an election nor a unanimity instruction is very helpful where the victim is unable to distinguish between a series of acts, any one of which could constitute the charged offense." People v. Jones, 792 P.2d 643, 650 (Cal. 1990) (en banc); see also State v. Arceo, 928 P.2d 843, 855 (Haw. 1996) (recognizing "that, in cases involving sexual abuse of minors, it is sufficient, in the indictment, to allege that the offense occurred over a particular time span" (quotation omitted)).

9

¶ 24. In Cooks, a case involving three separate acts of sexual penetration of a child on consecutive days, the Supreme Court of Michigan upheld the trial court's refusal to give a specific unanimity instruction, despite the defendant's request that it do so, because "materially identical evidence was offered with respect to each of the alleged acts of penetration and there is no reason to believe that the jury was confused or disagreed about the basis of defendant's guilt." 521 N.W.2d at 276, 284 (holding that general unanimity instruction is sufficient in multiple acts cases unless "1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt").

¶ 25. Many other courts have not found plain error for a failure to give a specific unanimity instruction in multiple-acts cases where the evidence concerning the alleged acts was not materially or conceptually distinct or the same blanket or generic defense was proffered with respect to all of the acts. For example, in a case involving charges of sexual abuse of minors, the Court of Appeals of Alaska found no plain error in the trial court failing to give a specific unanimity instruction where the defendant presented "one blanket defense" claiming that all of the charges were false and that he was innocent of any wrongdoing. Anderson v. State, 337 P.3d 534, 543 (Alaska Ct. App. 2014).

¶ 26. In finding no plain error, the court recognized that the charges were based on factually distinct acts of sexual contact and that "[t]he State's evidence concerning these acts varied somewhat in content and probative strength"; nonetheless, given the defendant's blanket defense, the court concluded that a different outcome was, even if a "logical possibility," not a "reasonable possibility."[4] Id.; see also Baker, 948 N.E.2d at 1179 (finding no plain error where

_____

[4] The court also noted the danger of attorneys "sandbagging" the trial court by making a tactical decision to not request a specific unanimity instruction and then claiming error on

"only issue was the credibility of the alleged victims" and "only defense was to undermine the young women's credibility"); Hill, 26 P.3d at 1275 ("By the jury's rejection of [the defendant's] general denial, we can unequivocally say there was no rational basis by which the jury could have found that [the defendant] committed one rape but did not commit the other."); People v. Van Dorsten, 494 N.W.2d 737, 739 (Mich. 1993) (concluding that failure to give unanimity instruction was not plain error because case turned on whether or not sexual assault occurred and thus there was no reason "to focus on the specifics of individual penetrations"); People v. Rao, No. 289343, 2012 WL 5233608, at 10 (Mich. Ct. App. Oct. 23, 2012) (finding no plain error where multiple acts of abuse resulting in various injuries of differing ages "were not materially distinct and all involved child physical abuse perpetrated on [the child]"); cf. Arceo, 928 P.2d at 875 (finding plain error where victim testified as to at least nine sexual assaults which could not be considered continuing offense and trial court failed to give specific unanimity instruction as to two distinct sexual assault charges against defendant); State v. Celis-Garcia, 344 S.W.3d 150, 159 (Mo. 2011) (en banc) (finding plain error where defendant "relied on evidentiary inconsistencies and factual improbabilities respecting each specific allegation of hand-to-genital contact").

¶ 27.    In this case, although the State also charged defendant with multiple counts of domestic assault based on specific bruises first noticed on specific dates, it charged defendant with cruelty to a child based on a myriad of bruises all over her body within a relatively short period of time—a little over a month.  At trial the State's principal argument—supported by medical evidence and testimony—was that the number and nature of the bruises on the child within a relatively short period of time pointed to child abuse and not accidental injury.

---

appeal; however, the court ultimately did not consider whether that occurred in that case. Anderson, 337 P.3d at 536, 543-44.

11

¶ 28. Defendant neither testified at trial nor presented witnesses, but his defense through his attorney's cross-examination of witnesses and arguments to the jury was that the alleged victim was "an active girl" with a "depth perception" problem who incurred accidental injuries easily and that no evidence connected him to any of the child's injuries. To be sure, through cross-examination, defendant suggested alternative reasons for some of the bruises—the child hitting her head on a bed frame to explain the two black eyes, hitting her head on a doorknob to explain the single black eye, and flea bites to explain the marks around the child's neck—but his generic defense was simply: I played no role in causing any of the child's bruises, and you have no evidence to show that I did.[5] Given that the child's various bruises could be considered neither materially nor conceptually distinct with respect to the child-cruelty charge, it is at least questionable whether the trial court committed any error at all in not giving a specific unanimity instruction on that charge.[6]

---

[5] The dissent insists that this is a clear case of "distinct instances," post, ¶ 57, and that, as the deputy state's attorney asserted at oral argument before this Court, the child-cruelty charge was premised primarily on the petechial bruising around the child's neck. Irrespective of what the deputy state's attorney may have stated to this Court at oral argument, the trial record does not show that the child-cruelty charge was based primarily on petechial bruising. The record, including the closing arguments by both the deputy state's attorney and defense counsel, shows that defendant's principal defense was that the child's multiple bruises were the result of accidents by an active child with depth perception problems, and the State's principal response was that the number and nature of the multiple bruises ruled out the accident defense. Right at the start of her closing argument, the deputy state's attorney told the jury that the "case is not about accidents" or a child who is "exceptionally clumsy" or "prone to accidents" or "unlucky," but rather about multiple unexplained injuries in a short span of time. Specifically, in addressing the child-cruelty count, the deputy state's attorney did not focus exclusively on the petechial bruising, but rather on the number of injuries, many of which the evidence indicated were not the type of injuries that would be caused by accidents. For his part, defense counsel emphasized in his closing argument that the victim was "a very active girl" with a depth-perception problem who galloped rather than walked around the rocky brook near her home. Other than the separately charged facial bruises, the State made no attempt to tie the multiple bruises to a specific day or instance; rather, it relied upon the fact that defendant's accident defense to the child-cruelty charge was not credible, given the number and nature of the bruises occurring within a relatively short time frame.

[6] Whether or not it goes over the line to constitute error, we encourage the trial courts to give a unanimity instruction in close cases to ensure defendants are not prejudiced.

12

¶ 29. In any event, in light of defendant's blanket defense to the charges against him, he was not prejudiced by the omission of a specific unanimity instruction, and thus there is no plain error. As noted, defendant consistently argued that there was no evidence connecting him to the child's injuries. Specifically, in arguing for a directed verdict with respect to the child-cruelty count, defense counsel stated that "with every other injury alleged, there's nothing that connects [defendant] to any of the other bruises on [the child's] body."

¶ 30. The absence of prejudice is particularly true in this case because the jury found defendant guilty of domestic assault with respect to the single black eye, and that is a sufficient basis to support the child-cruelty conviction. Defendant argues that the domestic-assault conviction is not dispositive as to the child-cruelty conviction because of the differing mens rea elements of the two offenses, with domestic assault requiring only recklessness but child cruelty requiring willfulness. We disagree.

¶ 31. The trial court instructed the jury that "recklessly" means defendant "was aware of and consciously disregarded a substantial and unjustifiable risk that, by acting as alleged, he would cause" pain or injury to the child. The court further instructed the jury that "willfully" means "consciously and intentionally." Regarding the single-black-eye injury, as with all of the other injuries, defendant did not contend that although he played a role in causing the injury, his conduct was not reckless. Rather, he contended that he played no role in causing the injury period. Although the victim's mother testified that defendant told her that he and the child had bumped into each other in the dark, causing the child to hit her head on a bathroom doorknob, defendant told police that he heard the child hit her head on the doorknob while he was in bed. Portions of that interview, including his explanation of the alleged doorknob incident, were admitted into evidence and played to the jury. In moving for a directed verdict and later making his closing argument, defense counsel focused on defendant's version—that defendant was in bed when he heard the child hit her head in the bathroom. Moreover, even if the jury considered

13

the mother's testimony regarding what defendant said to her, defendant's conduct could not be considered reckless under the trial court's definition.

¶ 32.    In short, defendant could be prejudiced by the absence of an unanimity instruction only if one or more jurors found, with no basis in the evidence, that he caused the single black eye injury, but acted recklessly in doing so, and acted willfully in causing some other injury. That a juror reached such a conclusion may be theoretically possible, but it is so highly unlikely that the mere theoretical possibility does not rise to the level of plain error.  The dissent surmises that it is "highly likely" that one or more jurors found defendant guilty of child cruelty based exclusively on one or more injuries other than the single black eye, post, ¶ 61, but we know that the jury unanimously convicted defendant on that charge and that defendant did not dispute the distinguishing element of intent based on the evidence presented to the jury.  At best, the dissent's "highly likely" characterization is speculative and cannot be the basis for a finding of plain error.

¶ 33.    To sum up, it is questionable whether a specific unanimity instruction was required at all under the circumstances of this case with respect to the child-cruelty charge, but even assuming it was, the trial court's failure to give such an instruction was not plain error, considering the nature of the alleged "acts" and the generic defense offered by defendant.  This is not one of those rare and extraordinary case where the interests of justice compel a finding of plain error.

## II. Cumulative Prejudice

¶ 34.    Defendant's second argument on appeal, applicable with respect to the remaining conviction for domestic assault in connection with the single black eye, is that various actions by the State cumulatively created a risk of undue prejudice, and that the trial court abused its discretion in denying defendant's motion for a mistrial on the basis of those actions.  Defendant does not specifically argue that the trial court committed error in connection with any of these

14

incidents, but instead contends that the State's conduct itself created such a risk of unfair prejudice that we must reverse the conviction. The bases for defendant's argument are as follows:

1. During the State's opening statement, counsel made reference to Emergency Care Order proceedings.
2. After being limited to factual and physical observations of the child's play, her teacher testified that the child played "angrily."
3. Upon presentation of the photographs she took when the child came to school with a black eye, the teacher broke down crying on the stand.
4. The State solicited from mother that defendant no longer lived with her and the child after the court ruled that the State could not ask mother whether she had ended her relationship with him.
5. The State solicited testimony from its expert witness, the nurse who examined the child, that strangulation was among the possible causes of petechia on the neck.
6. The State elicited testimony that a witness was concerned about the child.

¶ 35.	In arguing about the cumulative harm of the enumerated instances, defendant also suggests that the trial court abused its discretion in admitting testimony about various bruises and injuries to the child that were not linked by any evidence to defendant. To the extent defendant raises this as a distinct argument on appeal, the objection was not preserved below, and defendant's argument on appeal is not sufficiently developed to facilitate a plain error review on this point.

¶ 36.	A court "may grant a new trial if it believes that the cumulative effect of numerous concerns, no one of which can be characterized as reversible error, amounted to a miscarriage of justice." State v. Brooks, 2013 VT 27, ¶ 33, 193 Vt. 461, 70 A.3d 1014 (quoting State v. Aiken, 2004 VT 96, ¶ 9, 177 Vt. 566, 862 A.2d 285 (mem.)). We conclude that the trial court acted within its discretion in denying defendant's motion for a new trial. The State's reference in opening statements to the fact that DCF had obtained an emergency care order was fleeting. As soon as defendant objected, the court ruled that the State could not further discuss those child protection proceedings. The court noted that the State's reference was minor and

15

would be forgotten by the jury, and defense counsel declined a corrective instruction. The impact, if any, of the State's lapse was minimal.

¶ 37. Likewise, the State's questions eliciting testimony by the teacher that she observed the child playing in an angry manner had little if any impact on this case. The State did run afoul of the trial court's ruling excluding such questions, but the court immediately stopped the line of questioning and reprimanded the State. Because the testimony that came out—that this child was angry when she played—was so fleeting and unconnected to evidence that defendant committed the charged crimes, it had very little probative value or prejudicial effect in this case.

¶ 38. We acknowledge that the teacher's crying on the stand, had it continued unabated, may have aroused the jury's sympathies. But the second it surfaced, the trial court took a recess. The court made it clear to the State in no uncertain terms that it better not happen again, and the State structured its questions thereafter to ensure that it did not. In short, the impact of the teacher's momentary tearfulness during her testimony was minimal.

¶ 39. The State's question eliciting testimony that defendant no longer lived with mother following the trial court's ruling that the State could not ask whether they had ended their relationship was objectionable, but defendant points to nothing in the record to support the claim that prejudice flowed from this testimony. For that reason, we cannot conclude that this errant question and answer were more than minimally prejudicial, if at all.

¶ 40. The testimony by the nurse that strangulation could lead to petechial bruising "going a large direction around the neck" was objectionable and prejudicial. The State had not alleged that defendant strangled the child, and the court expressed doubt that testifying about how someone might cause such petechia, rather than just describing the types of forces necessary, was outside the witness's expertise. Again, the trial court immediately cut off the witness's testimony, and the State ended the line of questioning. And the testimony, while

16

potentially relevant to the child-cruelty charge as argued by the State, was not particularly relevant to the remaining conviction that we are reviewing: domestic assault for causing the single black eye. This fact substantially reduces the prejudice arising from the testimony.

¶ 41. Finally, defendant points to a question by the State as to whether a witness had a "concern" about the child. Although defendant objected and the court sustained the objection, the witness answered yes. The court promptly instructed the jury to ignore the answer. Moreover, in context, it appears that the question was simply designed to serve as a bridge from the teacher's observations of the child's injury to her act of offering the child ice for her eye. We discern no prejudice from this exchange.

¶ 42. In light of the foregoing, we conclude that the trial court was well within its discretion in denying defendant's motion for a new trial on the basis of the cumulative prejudice from the above instances, and thus we affirm defendant's convictions.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 43. **ROBINSON, J., dissenting.** I don't take issue with the legal standards articulated by the majority, but conclude that those standards compel reversal in this case. The jury heard evidence of multiple distinct instances of alleged abuse, with varying defenses and outcomes. In closing, with respect to the child cruelty charge, the State invited the jury to convict on the basis of any or all of them. On appeal, the State suggests with confidence that the jury was relying on a particular set of evidence in convicting on that count—completely different evidence from that relied upon by the majority in concluding that any error was harmless. On

17

this record, the failure to include a unanimity instruction was error, and the error was sufficiently prejudicial to constitute plain error.

¶ 44.  This is not the kind of "multiple-acts" case in which the evidence points to a multiplicity of relatively undifferentiated incidents and the defense is a general denial to any and all.  The State presented evidence of several distinct and dissimilar injuries to the child victim.  Some but not all were the basis for separate domestic assault charges.  The jury heard specific and varied defenses to each.  And the strength and quality of the State's evidence in support of its respective domestic assault charges varied widely from charge to charge: one charge never made it to the jury, the jury acquitted on one, and the jury convicted on one.

¶ 45.  The incident charged as domestic assault took place around September 7, 2012.  E.P.'s nursery school teacher testified that when E.P. arrived for her first day of school that year she had two black eyes.  The teacher described E.P.'s eyes as being "blackened."  The teacher testified that the eyes were not swollen, and looked like something had happen a couple days before.  She asked the mother about what had happened, and the mother reported that the child had fallen on a metal bedframe.

¶ 46.  In her own testimony, the mother explained that her boyfriend, defendant, was watching E.P. at the time of this injury.  When the mother arrived at the friend's apartment, she saw E.P. lying down with an icepack.  The mother removed the icepack and saw bruising and puffiness.  She reported that defendant told her that when he tried to put E.P. down for a nap, E.P. was "[fl]ailing around and hit her head off the metal bed frame."  The mother took E.P. home and continued to ice the bruised area, but did not otherwise seek medical attention.

¶ 47.  The nurse who testified as the State's medical expert explained that a blow to the forehead or scalp above the eyes can, after a period of time, lead to the kind of discoloration of both of the child's eyelids observed by the teacher, as the blood drains down from above the eyes.

18

¶ 48. In closing, defense counsel emphasized that, although the teacher testified that the child's eyes were discolored when the child reported to school, they were not swollen or puffy. He pointed to the nurse's testimony that this discoloration of the eyelids without accompanying swelling is consistent with an impact, some period prior, to the forehead or scalp—an injury consistent with defendant's explanation to the child's mother that the child had hit her head on the bed frame. Moreover, defense counsel noted that the testimony reflected that the injury occurred when the child was with defendant; based on the times defendant was with the child, it must have happened a few days before September 7. And he emphasized that between the time the injury likely occurred and the child's first day attending school, the child had a doctor's appointment. The doctor did not document any concerns about the bruising of the child's eyes. In short, although defendant generally denied the charges against him, the defense case in response to the charge relating to the two black eyes was specific to that incident. The defense argument was not simply "she must have tripped because she is not very coordinated" and "I had nothing to do with it." Rather, the evidence pointed to an innocent explanation for the specific bruising pattern that gave rise to one of the domestic assault charges.

¶ 49. This incident-specific defense must have been effective; the jury acquitted defendant of the domestic assault charge relating to the "two black eyes" claim.

¶ 50. The second charged incident led to bruising observed around September 18 The child's teacher testified that E.P. had been absent the prior day, and when E.P. returned to school on the eighteenth, she had a bruise on her face. On cross examination, the teacher testified that at that time the child also volunteered that she had a bruise somewhere else, although the teacher did not specify where.[7] Concluding that the State had not presented any evidence placing the child with defendant during the time period when the bruise appeared, the trial granted

---

[7] Counsel for both sides seem to assume that the teacher testified that the child either told her about or showed her bruising on the abdomen at that time; the record does not support this assumption.

defendant's motion for judgment of acquittal on this count. Although the court dismissed the specific charge relating to the bruising observed on September 18, the State's evidence concerning that bruise was before the jury as it deliberated on the child cruelty charge.

¶ 51. The third charged incident involved an injury the teacher observed on October 11, 2012. The teacher testified that the child had missed school the prior day and showed up to school with "a huge black eye." E.P's eye was "very swollen" and it appeared to the teacher that the injury "had happened recently." The court admitted photos taken that morning showing E.P. with a dark purple and blue bruise over her left eye. That morning, the teacher made a report to the Department for Children and Families (DCF).

¶ 52. Mother testified that on the morning when she saw E.P.'s eye defendant explained that the injury had occurred the night before when he was heading to the bathroom at the same time as the child. Defendant told her that they bumped into each other, and the child hit the doorknob. The investigating detective presented evidence, including a videotape of his interview of defendant, that shows defendant making inconsistent statements about the circumstances surrounding the left-eye injury, all of which involved hitting the bathroom doorknob. The nurse described the mechanism of injury that leads to bruising like that observed to the child's left eye: not a flat surface, but direct impact by something like a ball or body part of a person that hits right in the right area. Additionally, the jury heard evidence regarding the layout of the child's house and, in particular, the bathroom and bathroom door.

¶ 53. In closing, defense counsel reviewed the layout of the bathroom, including the height of the doorknob as compared to the child's height. He argued that E.P.'s injury was entirely consistent with going to the bathroom at night, in the dark, and hitting her eye against the doorknob on her way out. He bolstered this theory by noting the child had a visual depth perception problem. He noted the implausibility of defendant's hitting E.P. in the eye in the middle of the night without the mother hearing. And, he argued that defendant was left handed,

20

and that if a left-handed person punches another, the black eye would be on the right. The jury was not persuaded by these arguments, because it convicted defendant of domestic assault in connection with the black eye.

¶ 54. In addition to these instances that underlay the specific domestic assault charges, the jury heard extensive evidence about the nurse's observations upon performing a head-to-toe examination of E.P. on October 16, following the teacher's report to DCF. In addition to the bruised eyelids, the nurse noted a bruise about a centimeter wide on the child's cheek, a half centimeter bruise on the child's jawline, a small bruise on the child's forearm, two clusters of petechial bruising (tiny pinpoint bruises resulting from burst blood vessels) on one side of her neckline, bruising a couple centimeters wide on the left side of her ribs, a bruise near her bellybutton, and bruising on her shin.

¶ 55. The State elicited substantial testimony about these other injuries. The nurse opined that it's possible to bruise the cheek by accident, but not as likely as the forehead or chin, and that the jawline is likewise not a "leading edge" that is more prone to injury. She explained that petechial bruising arises from back pressure, or from occlusion of blood flow. As an example, the nurse explained that pulling clothing with enough force around the neck could cut off blood flow and cause petechial bruising. The nurse testified that the ribs are an area where she doesn't commonly see bruises on children. With respect to the abdominal bruising, the nurse opined that such bruising results from compression of the tissue from two hard objects outside of the body. The nurse testified that the shin bruising was typical in active children. The State did not attempt to specifically link these bruises to specific instances or to defendant in particular, beyond the broad inference that defendant was one of the adults caring for the child during the relevant time period.

¶ 56. With this understanding of the record, and applying the standards articulated by the majority, whether the court should have given a unanimity instruction is not a close call. The

21

majority acknowledges that generally in multiple-acts cases, the State is either required to elect a single act as a basis for the charged offense or the instruction requires the jury to be unanimous as to which act supports a conviction. Ante, ¶ 20. The majority explains that exceptions to this general rule apply in cases in which the evidence does not materially distinguish among the various acts in question, ante, ¶ 21, or "the same blanket or generic defense was proffered with respect to all of the acts." Ante, ¶ 25. Neither of these exceptions applies here.

¶ 57. This is not a case in which the evidence does not materially distinguish among the various acts in question. Perhaps the subset of the State's case relating to the assortment of bruises observed during the nurse's head-to-toe examination fits this description; but the State's case more broadly rested largely, albeit not exclusively, on very specific allegations of injuries allegedly inflicted by defendant on specific occasions. Defendant's arguments in response were likewise focused on specific and distinct instances. Although the defense suggested generally that this was an active but somewhat uncoordinated child with a visual impairment who was therefore prone to bruising, the defense strategy also rested in large part on specific theories as to the mechanism of the two most significant injuries at the center of the State's case. The fact that the jury was apparently swayed by defendant's argument with respect to one incident, but not another, highlights the material distinctiveness of the evidence with respect to the two main instances of alleged assault.

¶ 58. Nor can the defense in this case be fairly characterized as a "blanket" or "generic" defense that boils down to "I played no role in causing any of the child's bruises." Ante, ¶ 28. As set forth above, the defense in this case was not "I don't know what happened, but I didn't do it." With respect to the two most significant injuries—and the only ones specifically tied by timeline and opportunity to defendant—the defense offered plausible innocent explanations for the injuries that were arguably consistent with the physical and medical evidence. There was nothing "generic" about these two theories. Although they were bolstered by the generalized

22

suggestion that the child had visual depth perception issues and was not coordinated, the theories did not depend on this more general theme.

¶ 59. In that regard, this case is on all fours with State v. Celis-Garcia, 344 S.W.3d 150 (Mo. 2011) (en banc). In that case, a court instructed the jury that it could convict the defendant if it concluded that she had engaged in hand-to-genital contact with the child victim during the specified date range. The jury had heard evidence of several different instances of such conduct at different locations and different times. The defendant argued on appeal that because some of the jurors may have convicted her for one act and some may have convicted for another, the court's instructions rose to the level of plain error. The Missouri Supreme Court agreed that the instructions were error, "[b]ecause it is impossible to determine whether the jury unanimously agreed on any one of these separate incidents." Id. at 158. In considering whether the unpreserved error rose to the level of plain error, the court noted that the defense in this case did not simply argue that the victim's story was fabricated. The court assigned significance to the fact that the defense identified and relied on distinct "inconsistencies and factual improbabilities" in the State's evidence relating to each of several of the alleged instances rather than relying on a general denial. Id. at 158-59. Because the defense offered distinct, incident-specific arguments and defenses, the court concluded that it was "more likely that individual jurors convicted [the defendant] on the basis of different acts," and the conviction amounted to "manifest injustice." Id. at 159.

¶ 60. Again applying the standards articulated by the majority, I likewise conclude that the error in this case rises to the level of plain error. To satisfy plain error defendant must demonstrate that it is likely that some jurors convicted defendant on the basis of one incident or set of incidents, while other jurors convicted him on the basis of another. See ante, ¶ 19 (citing In re Carter, 2004 VT 21, ¶ 24, 176 Vt. 322, 848 A.2d 281).

23

¶ 61. The majority suggests that because the jury <u>could have</u> found defendant guilty of child cruelty on the basis of the single black eye in connection with which it convicted defendant of domestic assault, there is no plain error here. <u>Ante</u>, ¶ 28. But the question here is not whether there was sufficient evidence to convict defendant of child cruelty on that basis; it is whether it is likely that one or more jurors voted to convict defendant of child cruelty on the basis of evidence <u>other than</u> the single black eye. On this record, that is highly likely.

¶ 62. The State's argument to the jury on the child-cruelty charge did not rely on the single black eye. The deputy state's attorney mentioned the single black eye and the two black eyes, but then focused her argument regarding the child-cruelty count on all of the <u>other</u> observed injuries. She discussed the petechia in great detail, identifying possible causes, and ruling out innocent explanations. She talked about the bruise on the child's rib and argued that that was not a common place for a bruise. She pointed to the bruise on the child's abdomen and asserted that it was an intentional injury with force. She pointed to the bruise on the child's jaw line. She argued that throughout the time period in question defendant had repeated access to this child by himself and the child acquired unexplained bruises. The State's closing pointed to the multiplicity of bruises as evidence of willfulness, but did not key on any specific acts. This is not a case in which we can infer based on the way the case was argued that the jury was relying on a particular instance, such as the single black eye, in convicting defendant of child cruelty.

¶ 63. At oral argument on appeal, the Deputy State's Attorney, who was present at trial and had a firsthand sense of how this case was tried and received by the jury, opined with great confidence that the jury's conviction of child cruelty was based on the evidence of petechial bruising, <u>not</u> on the single black eye. She pointed to the State's closing argument below in support of this understanding.

¶ 64. The jury heard evidence of multiple distinct instances of unexplained or unusual bruising, many observed at different times and allegedly caused under different circumstances.

Counsel's arguments did not focus the jury on a particular instance of alleged abuse. The majority and the State—relying on the same record—both believe that the jurors all relied on the same instance of abuse, but their surmise as to which instance of abuse that is are completely different. Under these circumstances, I conclude that it is unlikely that all twelve jurors relied on the same claims of abuse in convicting defendant, and that the error in this case rises to the level of plain error.

_____
Associate Justice