NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 48

No. 22-AP-217

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, |
| | Criminal Division |
| | |
| James Menize | June Term, 2023 |

Michael J. Harris, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

James A. Valente of Costello, Valente & Gentry, P.C., Brattleboro, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Grearson, Supr. J. (Ret.), Specially Assigned

¶ 1. **CARROLL, J.** Defendant James Menize appeals a judgment of conviction, based on a jury verdict, of one count of aggravated sexual assault of a victim under the age of thirteen, and one count of lewd and lascivious conduct with a child. We affirm.

I. Background

A. 2011 Trial and 2018 Post-Conviction-Relief Order

¶ 2. This case has a long and complex history. In 2011, defendant was convicted on two counts of aggravated sexual assault of a victim under the age of thirteen. That conviction resulted from conduct occurring on the night of February 26, 2010, during which defendant digitally penetrated his then nine-year-old daughter, J.M., and her then ten-year-old friend and neighbor, L.S. A three-Justice panel affirmed the conviction on speedy-trial grounds in 2012.

State v. Menize, No. 2011-287, 2012 WL 5974994, at *4 (Vt. Sept. 26, 2012) (unpub. mem.) [https://perma.cc/TTS7-FWKJ].

¶ 3.     In 2018, the civil division granted defendant's petition for post-conviction relief, entered judgment in his favor, and returned the case to the criminal division for a new trial. Following extensive motion practice, the case was tried to a jury in October 2021. Defendant represented himself in the relevant pretrial proceedings and at trial.

### B. Pre-Trial

¶ 4.     Defendant filed motions to suppress inculpatory statements he made to law enforcement in an interview conducted at his home shortly after the events of February 26. He contended the statements should be suppressed because they were disclosed after he had requested an attorney while in custody and were otherwise involuntary. In an April 2020 order on the suppression motion, the trial court found the following. On March 3, 2010, Lamoille County Detectives Claremont and Sawyer went to interview defendant at the family home. Defendant was alone. The detectives were dressed in plain clothes. Their weapons and badges were not visible. Defendant invited them inside. The detectives told defendant that he was not under arrest, he was under no obligation to talk to them, and he could end the interview at any time. The detectives asked if it was okay to record the interview. Defendant said that it was. The detectives noted an odor of intoxicants coming from defendant and that his words were slurred at times. At one point, defendant got up to get some water and offered the detectives a glass. At another point, defendant wanted to smoke a cigarette and allowed the detectives to follow him to his basement bedroom to do so. Toward the end of the interview, defendant said the following: "I'm not saying anything anymore. I want my lawyer." However, he continued to talk to the detectives. He explained that he consumed almost a fifth of Southern Comfort on the evening of February 26, 2010, and did not remember what happened afterward. He admitted to getting into bed with J.M. and L.S. that night and sleeping in J.M.'s bed on other occasions, but denied ever touching either girl inappropriately.

2

A little over an hour into the interview, the detectives arrested defendant, but did not read defendant Miranda warnings.

¶ 5. The court partially granted the motion. It ruled that defendant was not in custody until the detectives arrested him, and all statements he made before the arrest therefore did not violate his right against self-incrimination under the federal and Vermont constitutions. The court concluded that the detectives were not required to stop questioning defendant after he requested a lawyer because Miranda does not apply to persons who are not in police custody. However, because the detectives continued questioning defendant following arrest but did not provide Miranda warnings, the inculpatory statements defendant made between arrest and the end of the approximately ninety-minute interview were suppressed. The court further concluded that statements defendant made prior to arrest were voluntary because the detectives did not inappropriately coerce defendant, that he was "coherent and aware," and that he never confessed to the allegations during the interview.

¶ 6. The State filed a motion in limine to admit prior bad acts under Vermont Rule of Evidence 404(b). Over objection, the court granted the motion on the record at a pre-trial hearing, ruling that the State could elicit testimony from J.M. concerning prior uncharged sexual acts to provide context of a continuous, abusive, sexual relationship between defendant and J.M. The court required the State to focus on four separate sexual acts, each occurring on different days.

¶ 7. The day before trial, the State sought leave to amend Count 2 with respect to L.S., from a count of aggravated sexual assault, victim under thirteen, 13 V.S.A. § 3253(a)(8), to lewd and lascivious conduct with a child, 13 V.S.A. § 2602. At the time of trial, L.S. could not remember sufficient details concerning the charged conduct for the State to proceed on the aggravated sexual-assault count. After a colloquy with defendant explaining the proposed new charge, the trial court accepted the amended information without objection.

3

## C. 2021 Trial

¶ 8. The following was adduced by testimonial evidence at trial. In 2010, J.M. and her three siblings lived with defendant and defendant's then wife—the children's mother—in Johnson, Vermont. Defendant slept alone downstairs as a matter of course. On the night of February 26, 2010, J.M.'s friend and next-door neighbor, L.S., spent the night with J.M. at the family home, which she had done before. At some point that evening, J.M. and L.S. went to bed in J.M.'s brother's bedroom. J.M.'s brother was not in the bedroom. J.M. and L.S. fell asleep together in the top bunk of a bunkbed while watching a movie. J.M. woke up with defendant laying between her and L.S. J.M. testified that defendant's "arm was under [L.S.'s] blanket," which to J.M. meant that he was "touching [L.S.'s] vagina" because "it had happened before." L.S. testified that defendant's hand was under her pajamas, but not under her underwear, and was moving in a circular motion on her vagina.

¶ 9. J.M. left that bedroom and eventually went to her bedroom, which J.M. shared with her sister. J.M.'s sister was not at home that night. Their bedroom had two twin beds, one for each sister. J.M. got into her sister's bed. Soon thereafter, L.S. came into J.M.'s bedroom and got into J.M.'s bed. Defendant followed L.S. and got into bed with her. J.M. heard "whispering, and it seemed like [L.S.] was struggling and very upset." L.S. testified that, at this point, defendant put his hand under her underwear and made a "rubbing motion on [her] vagina." Defendant told her that she was "going to be a beautiful wife to him and have his children," and that if she told anybody about what had happened that night he would "kill [her] family." L.S. then got into bed with J.M. Defendant again followed, and positioned himself between J.M. and L.S. At this point, defendant put his hand under J.M.'s underwear and digitally penetrated her vagina. Defendant then left after kissing both girls on the forehead. In the morning, J.M. told her mother what had happened. Mother reported the incident to Department for Children and Families (DCF), which launched an investigation culminating in the present charges.

4

¶ 10. J.M. further testified that on another occasion defendant made her watch pornography with him and forced her to perform oral sex on him while doing so. She testified that he had previously digitally penetrated her vagina, and forced J.M. to put her hand on his penis on a separate occasion. He threatened to kill J.M.'s mother if J.M. ever said anything about these events.

¶ 11. Defendant did not object to any of the above testimony. On cross-examination, defendant asked J.M. the following question: "isn't it also true that according to you . . . that I sexually abused you every single day for years." J.M. responded, "yes."

¶ 12. Defendant called Dr. Mantell as an expert witness. The questioning focused on contradictions and inconsistencies between J.M.'s interview with Detective Claremont on March 3, 2010, when she was nine years old, and J.M.'s interview with Detective Metayer on September 25, 2019, when she was nineteen. Each interview focused on what had happened on February 26 and the nature of J.M.'s relationship with defendant. Dr. Mantell testified that there were inconsistencies between the interviews.

¶ 13. The State called Dr. Halikias as an expert witness. It too asked Dr. Halikias about inconsistencies between the two interviews. Dr. Halikias stated, "I, frankly, was very surprised that [Dr. Mantell] falsely testified to a very important part of [the 2010 interview,]" and "it is clear in her interview at [nine] that she's talking about sexual touch, skin to skin. So[,] this is false information from Dr. Mantell in the report and during his testimony." Defendant objected to this testimony on grounds that it inappropriately provided an opinion about another witness's credibility. The court overruled the objection, but informed defendant that he could cross-examine Dr. Halikias to undermine his testimony, which defendant later attempted to do.

¶ 14. At the charge conference, the court explained to defendant that the proposed bad-act jury instruction was based on case law and model jury instructions and was drafted to instruct the jurors not to consider the evidence for the fact that "the February 26th matters occurred," but

only as context.  When asked if he objected, defendant indicated that he did not.  At trial, the court gave the following instruction to the jury:

> The law is strict about how you may use this evidence.  You may not consider this proof of [defendant's] bad character or as evidence that he was acting in the same way or doing the same thing he did previously.  In other words, you may not consider evidence of [defendant's] prior conduct as evidence he committed the alleged conduct for which he is now on trial.  You may consider it as evidence in the context within the charged incidents of sexual acts occurred, motive, opportunity, preparation, or plan, among other things.

Defendant again did not object.

¶ 15.    Defendant was ultimately convicted on both counts, as amended, and sentenced to a term of twelve years to life.  This appeal followed.

## II.  Arguments on Appeal

¶ 16.    Defendant raises multiple arguments on appeal.  He first contends that the trial court abused its discretion in admitting prior bad-act evidence, not curing J.M.'s trial testimony which characterized the bad acts as each occurring on more than once occasion, and providing a jury instruction that failed to cabin the resulting prejudice.  He next argues that the court should have suppressed all the inculpatory statements he made during the March 3, 2010, interview as either unconstitutionally elicited during a custodial interrogation without <u>Miranda</u> warnings or as involuntary.  He asserts that the timing of the amended information prejudiced his ability to put on an effective defense because the new charge contained a different mental state for which he did not have time to adequately prepare.  Finally, defendant contends that the court erred in overruling his objection to Dr. Halikias's testimony regarding Dr. Mantell.

¶ 17.    We conclude that the court did not abuse its discretion in its preliminary ruling granting the State's motion to admit bad-act evidence.  We hold that defendant did not preserve objections to either the State's line of questioning eliciting bad-act evidence at trial or the court's jury instruction, and we otherwise detect no error on either issue.  We further conclude that

6

defendant's statements were voluntary, but do not reach the issue of whether he was in custody prior to his arrest because he did not adequately brief the issue. Defendant additionally failed to preserve any objection to the amended information, and we do not reach the merits of the argument because defendant does not assert in his briefing that the argument survives plain-error review. Lastly, the trial court did not abuse its discretion in overruling defendant's objection to Dr. Halikias's testimony.

## III. Analysis

### A. V.R.E. 404(b)

¶ 18.    Defendant's first argument is three-fold: he contends that (1) the trial court abused its discretion in admitting prior bad-act testimony for context under Rule 404(b); (2) the trial court permitted the State to elicit bad-act testimony lacking the specificity the court had required in its ruling on the Rule 404(b) motion; and (3) that the jury instruction was prejudicial. Defendant preserved a pre-trial objection to the admission of prior bad-act testimony under Rule 404(b). However, he failed to object to either the breadth of the bad-act evidence at trial or the jury instruction. We therefore review the former for abuse of discretion, State v. Jones, 2008 VT 67, ¶ 14, 184 Vt. 150, 955 A.2d 1190, and the latter two questions for plain error. State v. Yoh, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853 ("When an issue has been forfeited through a party's failure to raise it below or brief it on appeal, we may consider it only under the rubric of plain error."); see V.R.Cr.P. 52(b). We first address defendant's pro se status because it is an undercurrent throughout this opinion.

### 1. Pro Se Litigants

¶ 19.    While we accord pro se litigants some leeway, they must still follow ordinary rules of procedure. Zorn v. Smith, 2011 VT 10, ¶ 22, 189 Vt. 219, 19 A.3d 112 (observing that while courts accord pro se litigants leeway in some matters, "they are still bound by the ordinary rules" of court procedure (quotation omitted)); see State Highway Bd. v. Sharrow, 125 Vt. 163, 164, 212

A.2d 72, 73 (1965) ("When [a pro se litigant tries his own case below] and the result is unsatisfactory, the [pro se] litigant must be given the same consideration as any other, no more and no less." (quotation omitted)). On the other hand, we have reversed decisions where the Court has found an "unconscionable advantage" enjoyed by the opponent of a pro se litigant. See Vahletich v. Knott, 139 Vt. 588, 590-91, 433 A.2d 287, 288-89 (1981) (remanding case because "unconscionable advantage" was taken of pro se litigant when litigant was not informed by court or attorney that litigant's father should file appearance, or that litigant could not represent father's interests (quotation omitted)).

¶ 20.     The federal and Vermont constitutions protect the right of a defendant to represent himself at trial "even though he may conduct his own defense ultimately to his own detriment." State v. Lewis, 155 Vt. 653, 655, 586 A.2d 550, 552 (1990) (mem.) (quotation omitted); see Wiesner v. Abrams, 726 F. Supp 912, 918 (E.D.N.Y. 1989) ("[E]ven in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires if he makes the choice 'with eyes wide open.' " (quotation omitted)). We have explained that even where a defendant admits he was not experienced enough to adequately represent himself at trial, such a concession "does not invalidate his deliberate choice to proceed pro se." State v. van Aelstyn, 2007 VT 6, ¶ 16, 181 Vt. 274, 917 A.2d 471.

¶ 21.     We can find no instance where the State or the court took "unconscionable advantage" of defendant in this case. Indeed, the court was careful throughout the proceedings to explain defendant's options in a given circumstance. In his opening statement, defendant represented to the jury that "even though I might not be educated in a university or school, I have been educating myself quite a bit for the past two years. I do not take this job lightly. And I want to assure everybody that I am fully capable of defending myself." We also note that defendant preserved objections to certain issues but not others, called his own witnesses, and conducted

8

cross-examinations of State's witnesses. With this background in mind, we proceed to defendant's arguments.

### 2. Preliminary Ruling to Admit Bad-Act Evidence

¶ 22. "[W]e give deference to the trial court's decision to admit bad-act evidence pursuant to Rule 404(b), and review its decision only for abuse of discretion." Jones, 2008 VT 67, ¶ 14. We must "determine whether the evidence 'was relevant to the cause of action, and if so, whether its admission was so prejudicial as to outweigh its probative value.' " State v. Anderson, 2005 VT 17, ¶ 7, 178 Vt. 467, 868 A.2d 716 (mem.) (quoting State v. Lipka, 174 Vt. 377, 390, 817 A.2d 27, 28 (2002)).

¶ 23. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have explained that "[i]n sexual assault cases, particularly those involving the family member of a minor . . . Rule 404 permits the admission of evidence regarding uncharged conduct to show a pattern of misconduct towards the victim." Anderson, 2005 VT 17, ¶ 8; see also State v. Forbes, 161 Vt. 327, 331-33, 640 A.2d 13, 15-16 (1993) (holding that 404(b)'s list is not exclusive and admission of evidence establishing pattern of misconduct with daughter establishes "specifically defendant's propensity to engage in sexual contact with his daughter as an object of his desire"). This is because "[a]llegations of a single act of sexual contact between a parent and child, taken out of its situational context of secrecy, oppression, and recurrence, are likely to seem incongruous and incredible." Forbes, 161 Vt. at 331-32, 640 A.2d at 15-16 (explaining further that "[j]urors may believe that fathers ordinarily do not molest their daughters only once and that the child must not be telling the truth without evidence of a pattern").

¶ 24.     The trial court did not abuse its discretion in admitting prior bad-act testimony.  The question is squarely controlled by Forbes and its progeny.  See, e.g., State v. Brown, 2010 VT 103, ¶ 7, 189 Vt. 88, 15 A.3d 107 (extending Forbes to case involving sexual assault of step-granddaughter in which several witnesses testified to defendant's paddling of victim and her sibling).  Just as in Forbes, the charged conduct consisted of a single act of a parent against a child.[1]  And, like Forbes, the State sought to elicit testimony about prior sexual contact between father and daughter, without which the jury might conclude J.M.'s testimony regarding defendant's conduct on February 26 was incredible.  See Brown, 2010 VT 103, ¶ 7 (discussing that one purpose of "context" evidence is to rebut inference that victim fabricated story).

¶ 25.     Here, the court required the State to focus on four separate prior acts: that (1) defendant touched J.M.'s vagina and bottom; (2) defendant forced J.M. to masturbate defendant; (3) defendant forced J.M. to perform oral sex on him; and (4) a different incident of digital, vaginal penetration.  The trial court expressed concern about the possibility of eliciting "broad amorphous" testimony instead of focusing on "specific incidents only" relating to "the same alleged victim here."  In response, the State represented that it was its "intent in eliciting the testimony [from J.M] that these are four separate acts on separate days."  The court responded, "Okay.  All right."  We conclude that the court did not abuse its discretion in allowing the State to elicit the testimony because "[t]estimony about these incidents helped to reveal the larger context surrounding the charged conduct, and it was thus within the trial court's discretion to allow the

---

[1]  At the pre-trial hearing, defendant raised the issue of the potential impact of J.M.'s testimony on the charge involving L.S.  On appeal, his sole reference to that issue appears to be in relation to the trial court's jury instruction, which defendant faults as prejudicial, see infra, ¶¶ 33-35, and argues: the instruction "was particularly relevant because the jury reviewed only J.M.'s testimony before convicting [d]efendant."  To the extent defendant is raising the argument on appeal that the court erred in admitting prior bad act testimony by J.M. for purposes of demonstrating context for the conduct against L.S., he fails to adequately brief it.  V.R.A.P. 28(a)(4); see also Kelly v. Univ. of Vt. Med. Ctr., 2022 VT 26, ¶ 29, 216 Vt. 445, 280 A.3d 366 ("We will not comb the record searching for error." (quotation omitted)).

victim to tell enough of her story to preserve its integrity as a credible one."[2] Anderson, 2005 VT 17, ¶ 9 (quotation and brackets omitted).

¶ 26. The danger of unfair prejudice did not outweigh the testimony's probative value under Vermont Rule of Evidence 403. V.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Unfair prejudice "arises from evidence whose primary purpose or effect is to appeal to a jury's sympathies and which may cause a jury to base its decision on something other than the established propositions in the case." Anderson, 2005 VT 17, ¶ 11 (quotation and alterations omitted). J.M.'s testimony tended to show that defendant had engaged in a pattern of conduct against her, including making intimidating statements about killing her mother if she disclosed defendant's behavior, which had some bearing on why she did not report the earlier abuse, and the testimony directly related to the charged conduct.

¶ 27. We are likewise unpersuaded by defendant's reliance on State v. Lipka, 174 Vt. at 397, 817 A.2d at 43, for the proposition that the court abused its discretion in admitting the evidence because "even a marginally relevant assertion that defendant had sexually abused his own daughter, and got away with it, was highly prejudicial." Lipka is distinguishable on multiple fronts; however, it is enough for present purposes to point out that the disputed evidence in Lipka was offered not by the victim, but by the defendant's daughter who was not involved in the charged conduct, to show "that absence of accident, or more generally defendant's intent, was genuinely in issue," not context. Id. at 391, 817 A.2d at 39. The charges in Lipka were based on the victim's testimony that the defendant had committed "up to 100" separate sexual acts against her over a period of less than one year. Id. at 393, 817 A.2d at 40. As we discussed, the defendant, in denying

---

[2] Defendant contends that the evidence should have been excluded because neither an issue of identity nor a defense of consent was at issue. This argument is without merit. The evidence was not offered for establishing identity or to attack a consent defense. It was offered to provide context of an abusive pattern of conduct of a father against his daughter.

any wrongdoing at all, was in effect conceding the mental elements—either the jury would believe the victim that he had committed the charged offenses, or it would believe him that he did not.  Id. at 391-92, 817 A.2d at 39-40.  Accordingly, among other reasons, we held that the court erred in admitting the daughter's 404(b) testimony to show lack of accident or intent when defendant had raised neither defense, and, relatedly, the testimony was unfairly prejudicial under Rule 403 because the testimony recounted conduct that was dissimilar to the charged conduct.  Id. at 392-92, 396-96, 817 A.2d at 39-40, 43.  Neither issue is in play here.

¶ 28.    Accordingly, the court did not abuse its discretion in granting the State's motion to admit prior bad-act evidence.

### 3.  Bad-Act Testimony

¶ 29.    We turn next to whether J.M.'s testimony regarding defendant's uncharged conduct toward her at trial, given without objection, constitutes plain error.  See State v. Brink, 2008 VT 33, ¶ 7, 183 Vt. 603, 949 A.2d 1069 (mem.) (holding that defendant must reassert objections at trial first made in pretrial proceedings).  The State only elicited testimony from J.M. regarding prior acts in which (2) defendant forced J.M. to masturbate defendant; (3) defendant forced J.M. to perform oral sex on him; and (4) a previous incident of digital, vaginal penetration.  Each question posed to J.M. included the phrases "specific" or "specific time" or "when."  J.M.'s responses did, at times, include past-continuous-tense constructions.  For example, the State asked, "can you think of a specific instance when [defendant] placed your hand on his penis?"  J.M. answered: "Yes.  I was in my bed trying to sleep, and he comes in again like every—like every time and goes under blanket and forces my arm around—around his penis . . . [and] he used his hand to make my hand give him a hand job forcefully."  Or to the question, "can you tell us what happened when [defendant] took you into the basement," J.M. responded:

> He made me watch porn, forced me to watch porn and, like, forced my head to where I—watched the porn.  And I just remember . . . trying to escape multiple times, and I was too small to escape, so I could never—I could never run up the stairs because

he would always pull my arm back. So—and while he was watching the porn, he would make me give him a blow job, force me to, with my head, and he—and it was very obvious that I didn't want to and that I was trying to get away. And every time I tried to get away, he would threaten that he would kill my mom if I ever went up there or said anything about it, so I never said anything.

¶ 30. To the extent, as defendant argues, that J.M.'s answers suggested the events were indicative of ongoing abuse, or lacked specific dates and times, defendant failed to preserve objections. Moreover, defendant's line of questioning on cross-examination immediately following J.M.'s bad-act testimony undercuts his argument. J.M. answered "yes" when defendant asked her, "isn't it also true that according to you . . . that I sexually abused you every single day for years?" Any concern he may have privately had during J.M.'s direct examination regarding what inferences the jury could have taken from the testimony was basically nullified at that point. The jury was free to believe J.M. if it wished to.

¶ 31. Defendant nevertheless contends that J.M.'s testimony lacked "similarity between the prior acts and the crime charged, and proximity in time." We discussed above why the events J.M. testified to are similar to the charged conduct. See supra, ¶¶ 25-26. With respect to temporal proximity, while it appears that J.M. did not place the uncharged conduct in time, a three-Justice panel of the Court has previously indicated that "we have not imposed a temporal requirement on prior bad acts introduced to provide context in domestic assault cases." State v. Burdick, No. 2008-158, 2009 WL 428058, at *3 (Vt. Feb. 4, 2009) (unpub. mem.) [https://perma.cc/99US-KZD5]. We refuse to do so here given defendant's lack of objection to the trial testimony and the lack of specific dates and times disclosed.

¶ 32. We conclude J.M.'s testimony did not violate the limits set by the trial court. Accordingly, this is not a case where an "error seriously affected substantial rights" and "had an unfair prejudicial impact on the jury's deliberations." State v. Oscarson, 2004 VT 4, ¶ 27, 176 Vt. 176, 845 A.2d 337.

4. Jury Instruction

¶ 33.    Defendant next contends that the trial court's jury instruction regarding J.M.'s 404(b) testimony was prejudicial because it failed to define "context," and failed to confine the jury's consideration of the evidence to context only.  He concedes that he did not preserve an objection to the instruction but argues that he should prevail under a plain-error standard.  "When reviewing alleged plain error in a jury instruction, we determine whether there was obvious error affecting the defendant's substantial rights, thereby resulting in prejudice to the defendant and seriously affecting the fairness or integrity of the juridical proceedings."  State v. Nicholas, 2016 VT 92, ¶ 13, 203 Vt. 1, 151 A.3d 799.  "This Court will find plain error only in extraordinary cases."  State v. Green, 2006 VT 64, ¶ 7, 180 Vt. 544, 904 A.2d 87 (mem.).  This is not such a case.

¶ 34.    The court instructed the jury that it must:

> not consider this [evidence as] proof of [defendant's] bad character or as evidence that he was acting in the same way or doing the same thing he did previously.  In other words, you may not consider evidence of [defendant's] prior conduct as evidence he committed the alleged conduct for which he is now on trial.

The instruction tracks with language in Rule 404(b)—"[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."  The court then instructed the jury that it could "consider [J.M.'s testimony] as evidence in the context within the charged incidents of sexual acts occurred."  This contains an explicit definition of "context."  That the instruction also provided that the jury could consider the evidence as "motive, opportunity, preparation, or plan, among other things," while not a model of clarity given the basis for admitting the testimony, is not an "obvious error," and not one resulting in prejudice that affects the fairness and integrity of the trial.  Nicholas, 2016 VT 92, ¶ 13.

¶ 35.    Our conclusion is not contrary to State v. Hendricks, 173 Vt. 132, 787 A.2d 1270 (2001).  There, the trial court gave an instruction, without objection, providing that the jury could

14

consider bad-act evidence for context only. However, the instruction did not expressly prohibit the jury from considering the testimony as evidence of defendant's character or that he acted in conformity therewith. While noting the absence of a prohibition to consider the evidence for character and propensity, we held that there was no plain error "where the court admitted prior bad acts evidence to show context, and issued limiting instructions requiring jurors to consider it for that purpose alone." Id. at 140-41, 787 A.2d at 1277. The instruction in this case did not limit the consideration of the evidence to context, but it did contain a clear instruction regarding context and appropriately proscribed the consideration of the evidence for character and propensity, the underlying "specter[s] of unfairness" the rule guards against. United States v. Schaffer, 851 F.3d 166, 179 (2d Cir. 2017).[3] As in Hendricks, the instruction was not plain error.

### B. Incriminating Statements

¶ 36. Defendant next contends that the court erred when it partially denied his motion to suppress all incriminating statements he made in the March 3, 2010, interview. Defendant raises two arguments—he asserts that after he asked for an attorney, any statement he made violated his right against self-incrimination because he was the subject of a custodial interrogation, and in the alternative, that all statements in the interview should be suppressed because they were involuntary. We accept a trial court's factual findings in an order on a suppression motion unless

---

[3] Or as put by the U.S. Supreme Court in Michelson v. United States:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief . . . . The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

335 U.S. 469, 475-76 (1948) (citations and footnotes omitted).

15

they are clearly erroneous. State v. Pontbriand, 2005 VT 20, ¶ 12, 178 Vt. 120, 878 A.2d 227. "But we review legal conclusions—such as whether law enforcement conducted a noncustodial interrogation and whether [the] defendant confessed voluntarily—de novo." State v. Kolts, 2018 VT 131, ¶ 5, 209 Vt. 351, 205 A.3d 504.

## 1. Custody

¶ 37.    Defendant contends that any incriminating statement he made after he invoked his right to counsel should have been suppressed because he was subject to a custodial interrogation at the time he made them.[4]  We conclude that defendant has failed to adequately brief this issue and decline to address it on the merits.

¶ 38.    An appellant's principal brief must contain "the issues presented, how they were preserved, and appellant's contentions and reasons for them—with citations to the authorities, statutes, and parts of the record on which the appellant relies." V.R.A.P. 28(a)(4)(A); Kelly, 2022 VT 26, ¶¶ 29-30 (same).  "It is the burden of the appellant to demonstrate how the lower court erred warranting reversal." In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988); see also Buttura v. Buttura, 143 Vt. 95, 98, 463 A.2d 229, 230 (1983) (stating that Supreme Court will not search record for error not adequately briefed).

¶ 39.    Defendant falls short of the standards for adequate briefing under Vermont Rule of Appellate Procedure 28(a).  He allocates one sentence to this argument in his principal brief.  He does not describe how the trial court erred, cite the record or case law, or provide any reasoning for his contention.  Defendant does cite two authorities but fails to explain why those authorities support his claim.  Without explanation, he cites State v. O'Neill, a case in which we affirmed the trial court's denial of the defendant's motion to suppress incriminating statements.  2019 VT 19,

---

[4]  "Under Miranda, as currently applied, the police must stop questioning a suspect who is in custody after he or she requests an attorney.  No such requirement exists, however, for suspects who are not in custody." Pontbriand, 2005 VT 20, ¶ 10 (citations omitted).  "A defendant seeking to suppress statements under this rule has the burden of proving that he or she was in police custody when the incriminating statements were made." Id.

¶ 46, 209 Vt. 599, 209 A.3d 1213. There, the defendant disclosed the statements after she invoked the right to counsel, and she was not provided <u>Miranda</u> warnings. However, we held that she was not in custody "during the time she made the statements she now seeks to suppress." <u>Id</u>. Defendant also cites <u>State v. Preston</u>, 150 Vt. 511, 516, 555 A.2d 360, 363 (1988), a case in which we held that a defendant interrogated in a Florida jail by Vermont law enforcement officers, and who had invoked his right to counsel in a separate investigation, was in custody for purposes of the Fifth Amendment. Even if we were inclined to review the merits of defendant's argument, we fail to see how either case advances his argument here. We will not search the record to locate the substance of defendant's arguments. <u>Kelly</u>, 2022 VT 26, ¶ 30.

### 2. Voluntariness

¶ 40. Defendant asserts that the incriminating statements made prior to his arrest were improperly admitted because they were involuntary. The trial court concluded that these statements were voluntary because the detectives did not coerce defendant into disclosing them. Defendant argues that the trial court erred because the detectives used deceptive interrogation techniques, promised leniency, and threatened more serious punishment if he did not admit to the events on February 26. He contends that these factors, in addition to his intoxication and lack of legal training, amounted to an unconstitutional interference with his deliberative process, and resulted in his disclosure of incriminating statements. We disagree.

¶ 41. The Due Process Clause of the Fourteenth Amendment and Chapter 1, Article 10 of the Vermont Constitution "prevent[] admission of involuntary statements into evidence, regardless of the defendant's custodial situation." <u>Pontbriand</u>, 2005 VT 20, ¶ 22. "[A] confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." <u>Id</u>. ¶ 21. To be voluntary, a confession must be "the product of a rational intellect and the unfettered exercise of free will." <u>State v. Caron</u>, 155 Vt. 492, 505, 586 A.2d 1127, 1134 (1990) (quotation omitted).

¶ 42. "The ultimate inquiry is whether, under the totality of the circumstances surrounding a confession, the suspect's will was overborne by the police." Pontbriand, 2005 VT 20, ¶ 22. When examining the totality of the circumstances, the Court looks to several factors to determine if a defendant's confession or inculpatory statement was the product of a rational intellect and the unfettered exercise of free will. "[B]oth the characteristics of the accused and the details of the interrogation" are relevant to the inquiry. State v. Reynolds, 2016 VT 43, ¶ 13, 201 Vt. 574, 145 A.3d 1256 (quotation omitted). Some factors we analyze include "the youth of the accused, his level of education, his level of intelligence, the extent the accused was advised of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep." State v. Lambert, 2021 VT 23, ¶ 37, 214 Vt. 425, 255 A.3d 747. The trial court relied on both the U.S. and Vermont Constitutions to partially deny defendant's suppression motion. Because neither party on appeal argues otherwise, we review the "underlying findings of fact for clear error" and "the legal question of voluntariness de novo."[5] Id.

¶ 43. Defendant first asserts that he was coerced because he was intoxicated and lacked legal training. The "characteristics of the accused," including "prior experience with the legal process" is a relevant factor in the voluntariness inquiry. Reynolds, 2016 VT 43, ¶ 13. However, defendant fails to elaborate on how his alleged lack of experience and intoxication impacted his susceptibility to coercion. He merely says such considerations are "relevant" and points us to a Ninth Circuit Court of Appeals case that deals with neither intoxication nor lack of legal training. Defendant does not suggest how the trial court erred on this question or engage with Vermont case

---

[5] We again note that previous decisions of this Court have left open the possibility that, under the Vermont Constitution, voluntariness is a question of fact reviewable under the more deferential clear-error standard. See Lambert, 2021 VT 23, ¶ 37 n.* (citing State v. Prue, 2016 VT 98, ¶ 23 n.3, 203 Vt. 123, 153 A.3d 551). Because no party argues otherwise, and because we affirm under the less deferential de-novo standard, we do not reach the question.

law on the topic.  See., e.g., Caron, 155 Vt. at 505, 586 A.2d at 1134.  Accordingly, we do not reach the merits of this aspect of his argument.  V.R.A.P. 28(a)(4).

¶ 44.  Defendant next argues that the detectives' psychological tactics, which, according to him included assertions of guilt, inferences of leniency, and threats of more serious punishment to him or harm to J.M. if he failed to confess, overwhelmed his free will.  "It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." Lambert, 2021 VT 23, ¶ 40 (quotation and brackets omitted).  Such "tactics only become illegally coercive when they are so manipulative or coercive that they deprive a defendant of his ability to make an unconstrained, autonomous decision."  Id. (quotation and brackets omitted).

¶ 45.  The detectives did not promise to minimize any potential prosecution or punishment if defendant admitted to the alleged conduct.  While the detectives did tell defendant that they could not "help" him if they did not "get to the root of the issue," this, if a psychological tactic at all, is a permissible "soft technique" that does not alone render statements involuntary. Id. ¶ 41 (explaining that telling defendant that he was not bad person and that victims of sexual assault often become abusive later in life are permissible "soft techniques") (quotation omitted). Indeed, none of the detectives' statements that defendant contends are improper had an impact on defendant's own "balancing of competing considerations."  See Pontbriand, 2005 VT 20, ¶ 22 (quotation omitted) ("Even where such tactics have an impact on a suspect's decision to talk to the police, the resulting statements are voluntary so long as they reflect a product of the suspect's own balancing of competing considerations." (quotation omitted)).  This is evident because defendant maintained his innocence throughout the interview, at times vigorously.  See Lambert, 2021 VT 23, ¶¶ 42-43 (affirming trial court's denial of suppression motion in part because defendant maintained his innocence throughout interview); see also State v. Brooks, 2013 VT 27, ¶ 24, 193 Vt. 461, 70 A.3d 1014 ("[Defendant's] continued assertion of innocence after waiving his rights strongly suggests . . . he did not feel manipulated or coerced . . . .").  For example, defendant said

19

that "I would not hurt my children in that way. I love my children." And in response to a question asking whether he would ever apologize to J.M. for inappropriately touching her, defendant said, "I wouldn't apologize for it because I didn't do it." He continued, "I'm not giving any wrong touches to anybody; I'm telling you right now. Okay? I am not admitting to being a pedophile."

¶ 46. For the same reason, defendant's argument that the detectives implied that there would be bad consequences for him if he failed to confess is without merit. Defendant characterizes the detectives as "suggest[ing] that if [d]efendant admitted to an unintentional, drunken instance of sexual contact, they would not conclude he was a pedophile." To the extent the interview transcript reveals that the detectives inferred this threat, which we do not conclude, he never confessed to sexual contact with J.M. or L.S. Because defendant never confessed, his argument that the detectives' "tactics made it impossible for [him] to make a rational choice whether to confess," fails. See Prue, 2016 VT 98, ¶ 40 ("[D]efendant was resistant to some of the interrogation tactics, undermining defendant's claim that his confession was involuntary.").

¶ 47. Given the totality of the facts and circumstances, we conclude that defendant's statements made during the interview were voluntary. The trial court did not err when it partially denied the suppression motion.

### C. Amended Information

¶ 48. Defendant next argues that the court erred by permitting the State to amend the information the day before trial. Vermont Rule of Criminal Procedure 7 permits the State to amend an information before trial under certain conditions and contingent upon the court's discretion. V.R.Cr.P. 7(d).[6] Defendant did not object to the amendment, and defendant does not seek plain-error review on appeal.

---

[6] We note that Criminal Rule 7 was amended in January 2022, and now includes, for the first time, a subdivision governing pre-trial amendments to the information. Reporter's Notes—2022 Amendment, V.R.Cr.P. 7 ("Subdivision (d) is added to address amendment of an information or indictment prior to trial, including but not limited to late-stage amendments that may be authorized in the period when a case has been scheduled for final pre-trial conference, jury

¶ 49.     In addition to properly preserving objections for appellate review, we have required defendants to address why their arguments survive plain-error review to reach the merits.  State v. Nash, 2019 VT 73, ¶ 14, 211 Vt. 160, 221 A.3d 386 (collecting cases); see also State v. Brown, 2010 VT 103, ¶¶ 15-16, 189 Vt. 88, 15 A.3d 107 (declining to reach unpreserved arguments regarding limiting instruction where plain error not was briefed on appeal).  Here, defendant did not object to the amended information below.  His brief contains no argument about why his constitutional right to notice of the charges against him was violated by the amended information.  And, crucially, he does not argue why he should prevail under a plain-error analysis.  Therefore, we decline to reach the merits of defendant's argument.

### D.  Dr. Halikias's Testimony

¶ 50.     Lastly, defendant contends the trial court erred when it permitted the State's expert to opine on the credibility of his own expert witness.  Defendant argues that Dr. Halikias offered testimony that accused Dr. Mantell of perjury when he said the following: "I, frankly, was very surprised that [Dr. Mantell] falsely testified to a very important part of [the 2010 interview,]" and "it is clear in her interview at [nine] that she's talking about sexual touch, skin to skin.  So[,] this is false information from Dr. Mantell in the report and during his testimony."  We disagree.

¶ 51.     "The decision of whether to admit expert testimony is committed to the trial court's discretion and will not be disturbed 'unless it is made to appear from the evidence that it was clearly erroneous or founded on an error of law.' "  State v. Onorato, 142 Vt. 99, 104, 453 A.2d 393, 395 (1982) (quoting Currier v. Letourneau, 135 Vt. 196, 203, 373 A.2d 521, 526 (1977)); see also USGen New Eng., Inc. v. Town of Rockingham, 2004 VT 90, ¶ 24, 177 Vt. 193, 862 A.2d

---

selection, and trial.").  The trial occurred in October 2021.  Accordingly, Criminal Rule 7 did not, in fact, apply to the amended information under the previous subdivision (d).  See State v. Beattie, 157 Vt. 162, 169-70, 596 A.2d 919, 924 (1991) (explaining that "Rule 7(d) applies only after trial has commenced" and it does not commence at voir dire).  Instead, had we reached the merits here, we would have analyzed the question only for whether the court violated "the constitutional guarantee of fair notice of the charges against [defendant]."  Id. at 170, 596 A.2d at 924.  Neither party briefs this correctly.

269 ("Absent a clear showing of judicial error, we will affirm the trial court's decision to admit or exclude the proffered testimony.").

¶ 52. Following defendant's objection, the trial court concluded that Dr. Halikias's statements regarding Dr. Mantell's testimony were not judgements of Dr. Mantell's credibility. The statements instead represented Dr. Halikias's opinion that Dr. Mantell's professional judgements regarding the inconsistencies between J.M.'s 2010 and 2019 interviews were incorrect. The court explained that if defendant felt there was a misstatement or discrepancy in Dr. Halikias's testimony, he could address the issue on cross-examination. On cross-examination, defendant questioned Dr. Halikias about his statement, including asking him the following: "You stated that Dr. Mantell gave false testimony; isn't that correct?" Dr. Haliakis answered, "yes."

¶ 53. The court did not abuse its considerable discretion. To the extent Dr. Halikias's statement went to impeaching Dr. Mantell's credibility, which we do not suggest, the court was well within its discretion to overrule defendant's objection and instruct him to attempt to undermine Dr. Haliakis's testimony on cross-examination. We note that defendant did not request a curative instruction. See State v. Turner, 145 Vt. 399, 403, 491 A.2d 338, 340 (1985) ("Defense counsel bears some responsibility to inform the court if he or she feels corrective action is necessary in order to cure an error."). The jury was therefore free to make its own determinations about the witnesses and the credibility of their competing testimonies. State v. Hinchliffe, 2009 VT 111, ¶ 22, 186 Vt. 487, 987 A.2d 988 ("We will not second-guess the jury's determination of credibility . . . .").

¶ 54. We affirm.

Affirmed.

FOR THE COURT:

_____
Associate Justice

22